917 F.2d 620
 Robert E. SCHNEIDER, Jr., et al., Plaintiffs, Appellees,
v.
COLEGIO de ABOGADOS de PUERTO RICO, Defendant, Appellant.
Robert E. SCHNEIDER, Jr., et al., Plaintiffs, Appellees,
v.
COLEGIO de ABOGADOS de PUERTO RICO, et al., Defendants, Appellees.
Appeal of Carmen Ana CULPEPER, etc., et al., Defendants.
Robert E. SCHNEIDER, Jr., et al., Plaintiffs, Appellants,
v.
COLEGIO de ABOGADOS de PUERTO RICO, et al., Defendants, Appellees.
 Nos. 88-1937 to 88-1939.
 United States Court of Appeals,
First Circuit.
 Heard Nov. 2, 1989.
Decided Oct. 24, 1990.
Rehearing and Rehearing En Banc
Denied Dec. 20, 1990.
 
 Robert E. Schneider, Jr., with whom Hector L. Marquez was on brief, for Robert E. Schneider, Jr., et al.
 Anabelle Rodriguez-Rodriguez, Asst. Sol. Gen., with whom Rafael Ortiz-Carrion, Sol. Gen., Jorge E. Perez Diaz, Sol. Gen., and Norma Cotti-Cruz, Deputy Sol. Gen., were on brief for Carmen Ana Culpeper, etc., et al.
 Harry Anduze Montano with whom Carlos V. Garcia Gutierrez, Carlos A. Rodriguez Vidal, Pia Gallegos, Patricio Martinez, and Carlos Ramos, were on brief, for Colegio de Abogados de Puerto Rico.
 Before CAMPBELL, Circuit Judge, COFFIN, Senior Circuit Judge, and PIERAS,* District Judge.
 COFFIN, Senior Circuit Judge.
 
 
 1
 This case requires us to add another chapter, still not the final one, to an already lengthy saga concerning the constitutionality of Puerto Rico's system of mandatory bar membership. In the decision on appeal, the United States District Court for the District of Puerto Rico held that compelled membership in the bar association known as the Colegio de Abogados de Puerto Rico ("Colegio") is unconstitutional in its present form. Schneider v. Colegio de Abogados de Puerto Rico, 682 F.Supp. 674 (D.P.R.1988). The district court also invalidated statutes requiring that lawyers affix official stamps, sold by the Colegio, to all court documents. We agree that the present system is constitutionally deficient, and therefore in large part affirm the conclusions of the district court. We modify the court's judgment, however, to delay temporarily an injunction prohibiting mandatory dues so that the Colegio may remain integrated while it attempts to correct its constitutional defects.[1] We also limit the court's holding on the stamp statutes.
 
 I. Legal and Factual Background
 
 2
 We detailed the origins and early history of this case at length when the dispute last came before us. See Romany v. Colegio de Abogados de Puerto Rico, 742 F.2d 32 (1st Cir.1984). The district court in its most recent decision also set forth a thorough review of the prior proceedings. See Colegio, 682 F.Supp. at 675-679. We see no need to repeat, once again, the full factual and procedural background of this case. This opinion therefore shall contain only that history necessary for a full understanding of the issues we decide today.
 
 
 3
 Accordingly, we begin this background section by stating briefly the constitutional claim raised by plaintiffs and reviewing the federal law relevant to that claim. The next subsection describes the Colegio system as it presently exists. We then review the district court's decision. In Section II of the opinion, we briefly discuss jurisdiction and appealability issues. Section III contains our analysis and conclusions. The remaining sections discuss the stamp issue and damages, and provide a brief summary of the opinion.
 
 A. Constitutional Principles
 
 4
 Plaintiffs, five attorneys, claim that Puerto Rico's mandatory system of bar membership violates their First Amendment freedom of association by depriving them of the right not to associate with the Colegio, which conducts activities they find objectionable.[2] Their primary complaint is that the Colegio uses their compulsory dues and fees to publicly espouse views and support causes, with which they disagree, on controversial issues far removed from the immediate concerns of lawyers. These issues have in the past included supporting the Sandinista Front for National Liberation in Nicaragua, forcing the United States Navy to leave the island of Vieques, stopping the draft, and amending the electoral law in Puerto Rico. See Schneider v. Colegio de Abogados de Puerto Rico, 565 F.Supp. 963, 966-971 (D.P.R.1983); 682 F.Supp. at 679-681.
 
 
 5
 In a decision reached after oral argument in this case, and for which we held up our opinion, the United States Supreme Court addressed a virtually identical claim made by 21 members of the California bar. In Keller v. State Bar of California, --- U.S. ----, 110 S.Ct. 2228, 110 L.Ed.2d 1 (1990), the Court reaffirmed its earlier conclusion that compelled membership in a state bar association, and the exaction of compulsory dues, do not per se violate an individual's First Amendment rights, see Lathrop v. Donahue, 367 U.S. 820, 81 S.Ct. 1826, 6 L.Ed.2d 1191 (1961).[3] The Court went on, however, to establish for the first time that the principles it previously had developed for the permissible use of compulsory union dues are equally applicable for the use of mandatory bar dues.
 
 
 6
 Abood [v. Detroit Board of Education, 431 U.S. 209 [97 S.Ct. 1782, 52 L.Ed.2d 261] (1977) ] held that a union could not expend a dissenting individual's dues for ideological activities not "germane" to the purpose for which compelled association was justified: collective bargaining. Here the compelled association and integrated bar is justified by the State's interest in regulating the legal profession and improving the quality of legal services. The State Bar may therefore constitutionally fund activities germane to those goals out of the mandatory dues of all members. It may not, however, in such manner fund activities of an ideological nature which fall outside of those areas of activity.
 
 
 7
 110 S.Ct. at 2236.
 
 
 8
 The Supreme Court recognized that its limitation on the use of mandatory bar dues was not self-executing and that a difficult problem remained in defining the class of activities germane to "regulating the legal profession and improving the quality of legal services." Id. The Court again found the union context helpful in setting guiding principles, and quoted from its decision in Ellis v. Railway Clerks, 466 U.S. 435, 448, 104 S.Ct. 1883, 1892, 80 L.Ed.2d 428 (1984):
 
 
 9
 "[W]hen employees such as petitioners object to being burdened with particular union expenditures, the test must be whether the challenged expenditures are necessarily or reasonably incurred for the purpose of performing the duties of an exclusive representative of the employees in dealing with the employer on labor-management issues. Under this standard, objecting employees may be compelled to pay their fair share of not only the direct costs of negotiating and administering a collective-bargaining contract and of settling grievances and disputes, but also the expenses of activities or undertakings normally or reasonably employed to implement or effectuate the duties of the union as exclusive representative of the employees in the bargaining unit."
 
 
 10
 We think these principles are useful guidelines for determining permissible expenditures in the present context as well. Thus, the guiding standard must be whether the challenged expenditures are necessarily or reasonably incurred for the purpose of regulating the legal profession or 'improving the quality of the legal service available to the people of the State.' Lathrop, 367 U.S., at 843 [81 S.Ct. at 1838] (plurality opinion).
 
 
 11
 110 S.Ct. at 2236. Even with this standard, however, the Court acknowledged that the line will be difficult to draw
 
 
 12
 between those State Bar activities in which the officials and members of the Bar are acting essentially as professional advisors to those ultimately charged with the regulation of the legal profession, on the one hand, and those activities having political or ideological coloration which are not reasonably related to the advancement of such goals.... But the extreme ends of the spectrum are clear: Compulsory dues may not be expended to endorse or advance a gun control or nuclear weapons freeze initiative; at the other end of the spectrum petitioners have no valid constitutional objection to their compulsory dues being spent for activities connected with disciplining members of the bar or proposing ethical codes for the profession.
 
 
 13
 Id. at 2237.
 
 
 14
 The Court in Keller also acknowledged that state bar associations may encounter added inconvenience or burden in ensuring that compulsory dues are used only for permissible purposes, but observed that " 'such additional burden or inconvenience is hardly sufficient to justify contravention of the constitutional mandate,' " 110 S.Ct. at 2237 (quoting Keller v. State Bar, 47 Cal.3d 1152, 1192, 255 Cal.Rptr. 542, 568, 767 P.2d 1020, 1046 (1989) (Kaufman, J., concurring and dissenting)).
 
 
 15
 The Court therefore held that a permissible system of mandatory bar membership must include a mechanism for protecting the rights of dissenting members to withhold financial support of activities that fall outside the bar's core purposes.[4] On the limited record before it, the Court declined to speculate on the various methods a bar association might adopt to accomplish the required segregation of funds. The justices noted, however, that the procedure they deemed adequate for unions in Teachers v. Hudson, 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986), also would suffice in the bar setting. 110 S.Ct. at 2237. In Hudson, the Court held that "the constitutional requirements for the collection of ... fees include an adequate explanation of the basis for the fee, a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker, and an escrow for the amounts reasonably in dispute while such challenges are pending." 475 U.S. at 310, 106 S.Ct. at 1078.
 
 
 16
 Before turning to our analysis of whether the Colegio system, which is modeled after the Hudson procedure, fulfills these constitutional requirements, we complete our background summary by describing that system and why the district court found that it is inadequate to protect its members' First Amendment rights.
 
 B. The Colegio System[5]
 
 17
 In 1982, in the course of state proceedings involving some of the attorneys who are plaintiffs in this federal case, the Supreme Court of Puerto Rico upheld under state law compulsory membership in the Colegio and compulsory financial support of the bar. See Colegio de Abogados v. Schneider, 112 D.P.R. 540, 12 Official Translations of the Opinions of the Supreme Court of Puerto Rico 676 (1982). Consistent with federal law, however, the court held that lawyers who dissented from ideological activities not related to the Colegio's purposes must have the right to prevent the use of their funds for those activities. The court ordered that a remedy be designed to protect the dissenters' right to object and, in a 1986 ruling, it adopted the rebate and escrow procedure that is challenged in this case ("the 1986 Rule"). Schneider v. Colegio de Abogados, 117 D.P.R. 504 (1986), Official Translation of the Supreme Court of Puerto Rico, slip op. (June 26, 1986) (hereinafter Schneider, Official Translation).
 
 
 18
 The elements of the Supreme Court procedure are as follows:
 
 
 19
 1. An interest-bearing escrow account must be set up, into which 15 percent of dissenting attorneys' dues will be deposited.
 
 
 20
 2. Dissenting attorneys may, at the time they pay their dues, file a general objection to the use of their dues for ideological activities unrelated to the core purposes of the Colegio, and eventually receive a refund of the proportion of their dues based on the cost of all activities found to be "objectionable," or
 
 
 21
 3. Attorneys may object on a case-by-case basis throughout the year, receiving a proportionate refund based on the cost of the specific activities to which they objected.
 
 
 22
 4. A three-member panel, composed of retired members of the Puerto Rico judiciary, will determine which activities are truly "objectionable" and whether the 15 percent escrow figure should be modified at some later date. This Review Board has promulgated regulations governing the objection procedure. See App. II at 323-344.
 
 
 23
 5. Dissenting members may not object to the use of their funds for activities related to any of 15 listed "functions and purposes" of the Colegio. Schneider, Official Translation, slip op. at 17-18.
 
 C. The District Court Opinion
 
 24
 1. Defects. The district court found two significant defects in the Supreme Court's remedy. First, it held that the 1986 Rule fails to limit adequately the types of activities that may be funded with compulsory fees. Second, the method used to accommodate dissenting members, including the 15% escrow, falls short of the procedures required by the Supreme Court for protecting dissenters' rights. We now describe its findings with regard to each of these in some detail.
 
 
 25
 a. Activities Suitable for Compulsory Funding. The 1986 Rule provides for mandatory support for all "[a]ctivities comprised within the Bar Association's purposes and ends which are germane thereto." Schneider, Official Translation, slip op. at 17. In other words, if an activity promotes a purpose of the Colegio, dissenters may be compelled to subsidize it. The problem, in the district court's view, is that the Puerto Rico Supreme Court has defined too broadly the "purposes and ends" that justify mandatory financial support. The court in particular rejected two purposes articulated by the Puerto Rico court in support of the integrated bar: " 'the creation of a strongly pluralistic society,' " Schneider, Official Translation, slip op. at 13 (quoting Schneider, 112 D.P.R. at 549) and "contribut[ing] to the betterment of the administration of justice," id. at 18.
 
 
 26
 The district court's concern was that almost any activity could be said to advance one or both of these interests, and that dissenting lawyers therefore would be compelled to accept the Colegio's publicly expressed viewpoint as representing them on a vast number of sensitive issues. "Accepting these standards as the guides to determine permissible bar activity," the court stated, "would be tantamount to a complete abdication of the court's duty to protect dissenting attorneys' First Amendment rights." 682 F.Supp. at 683.
 
 
 27
 The district court therefore articulated its own list of "permissible purposes" for which financial support may be compelled. These purposes, which the court acknowledged may not be exhaustive, all revolve around the role of the lawyer as lawyer, rather than relying on the lawyer's more generic role as an informed and perhaps influential member of a complex society. The four areas are: monitoring attorney discipline, ensuring attorney competence, increasing the availability of legal services and improving court operations. Activities that promote one or more of these purposes, and which therefore may be funded by mandatory dues and fees, could include continuing legal education programs, legal aid services, public education on substantive areas of the law (e.g., landlord-tenant) that would help citizens recognize and enforce their legal rights, and public commentary on such matters as rules of evidence and attorney advertising.[6]
 
 
 28
 b. Procedures. The district court found procedural problems with the 15% escrow amount and with the manner of filing objections.
 
 
 29
 The escrow system is inadequate, the district court held, because the 1986 Rule fails to require a detailed accounting showing how the Colegio spends its funds, and how it calculated the 15% setaside. The court relied on Hudson in holding that the Colegio each year must precisely calculate the escrow percentage based on its projected budget and its estimate of expenditures to be made for objectionable purposes. 682 F.Supp. at 687-688. It held that the Colegio not only must explain the basis for the escrow amount, but also must justify the entire amount to be collected. The court further held that the Colegio must include a "buffer" in the escrow percentage to ensure that, if the impermissible expenditures exceed the amounts budgeted for them, the funds required to be returned to dissenting members do not exceed the escrowed amount.
 
 
 30
 The other procedural problem noted by the district court is the requirement that dissenters file objections to specific activities in order to receive a refund.[7] The court held that, under Abood, a dissenter may not be required to object specifically to an activity because this " 'would confront an individual ... with the dilemma of relinquishing either his right to withhold his support of ideological causes to which he objects or his freedom to maintain his own beliefs without public disclosure.' " 682 F.Supp. at 689 (quoting Abood, 431 U.S. at 241, 97 S.Ct. at 1802).
 
 
 31
 2. State of the Record. The district court unquestionably was bothered by the state of the record before it. Despite repeated invitations, defendants failed to present evidence concerning the extent of the Colegio's non-ideological activities. Instead, they urged the court to take judicial notice of the lengthy list of law-related activities conducted by the Colegio that was contained in the 1986 opinion of the Supreme Court of Puerto Rico. See Schneider, 682 F.Supp. at 692-94 (Appendix A). See also Schneider, Official Translation, slip op. at 25-43 (Appendix listing activities).[8] That court had found that the Colegio's ideological activities were de minimis. Id. at 13.
 
 
 32
 In contrast to the lack of evidence regarding non-ideological activities, the district court received substantial evidence of the partisan political activities undertaken by the Colegio. See 682 F.Supp. at 679-681. No party, however, provided the court with quantitative or comparative data showing what percentage of Colegio activities typically are devoted to each category. Accordingly, the court felt obliged to conclude "that the ideological activities of the Colegio constitute a large and inseparable proportion of the Colegio's total activities." 682 F.Supp. at 681.[9]
 
 
 33
 Despite the problems it found, the district court stated its belief that the Colegio could devise a lawful procedure incorporating most of the features of the 1986 Rule. 682 F.Supp. at 691. In the absence of appropriate modifications, however, the court held that the Colegio either must cease all ideological activities not germane to its core purposes or it may not compel membership. So long as the status quo remained, defendants were enjoined from taking any action against any lawyer for failing to pay fees to the Colegio.
 
 II. Jurisdiction and Appealability
 
 34
 Before delving into our own discussion of the Colegio mandatory membership system, we briefly address the parties' various contentions that the case is not properly before us. The defendants claim that principles of federalism, res judicata and collateral estoppel bar our review. Plaintiffs argue that defendants failed to perfect their appeals because of untimely and incorrect filings. We reject all of these claims.
 
 
 35
 Jurisdiction and Preclusion. It is well-established that lower federal courts have no jurisdiction to hear appeals from state court decisions, even if the state judgment is challenged as unconstitutional. Review of state decisions may be obtained only in the United States Supreme Court. See D.C. Court of Appeals v. Feldman, 460 U.S. 462, 476, 103 S.Ct. 1303, 1311, 75 L.Ed.2d 206 (1983); Rooker v. Fidelity Trust Co., 263 U.S. 413, 416, 44 S.Ct. 149, 150, 68 L.Ed. 362 (1923). See also 28 U.S.C. Sec. 1257. In Feldman, the Supreme Court considered the so-called Rooker doctrine specifically in the context of attorney challenges to rules and regulations governing the bar, in that instance relating to bar admission. The Court carefully distinguished between "general challenges to state bar rules, promulgated by state courts in nonjudicial proceedings"--for which there is jurisdiction in the lower federal courts--and "challenges to state-court decisions in particular cases arising out of judicial proceedings," 460 U.S. at 486, 103 S.Ct. at 1317--for which there is not.
 
 
 36
 Defendants claim that the Rooker doctrine is triggered in this case because plaintiffs are, in effect, attempting to appeal the Puerto Rico Supreme Court's decisions in the Schneider case. According to defendants, the 1986 Rule was the particular judicial remedy ordered in the original Commonwealth Schneider case, and the district court therefore had no jurisdiction to consider its validity.
 
 
 37
 We disagree, primarily for the reasons identified by the district court. 670 F.Supp. 1098, 1100-1103. The fate of attorneys Schneider and Ramos--the particular judicial decision made in the Commonwealth court--is not at issue here. Plaintiffs challenge not the outcome of that specific case, but the general Colegio system of mandatory bar membership, as defined by various statutory provisions and the 1986 Rule. Although the motivation for the 1986 Rule originated with the Schneider-Ramos case, we are persuaded that the Supreme Court invoked its inherent powers over the bar to go beyond their individual complaints to accomplish needed bar reform. See Romany, 742 F.2d at 34 n. 3, 40 & 42 (Puerto Rico Supreme Court has "unique latitude" to regulate the bar). That the court chose to combine its rulemaking with its adjudication in the form of a single opinion does not detract from the nonjudicial nature of the Rule. See Feldman, 460 U.S. at 482, 103 S.Ct. at 1314 (" '[T]he form of the proceeding is not significant. It is the nature and effect which is controlling.' ") (quoting In re Summers, 325 U.S. 561, 567, 65 S.Ct. 1307, 1311, 89 L.Ed. 1795 (1945)). See also Zimmerman v. Grievance Com. of Fifth Jud. Dist., 726 F.2d 85, 86 (2d Cir.1984) (referring to the possibility of a combined adjudication and rulemaking in single opinion); Razatos v. Colorado Supreme Court, 746 F.2d 1429, 1433 (10th Cir.1984) (finding jurisdiction after noting that "[t]he distinction is often difficult to draw" between "general challenges to state bar rules as promulgated and challenges to state court decisions in particular cases.")
 
 
 38
 Moreover, a contrary conclusion on the nature of the 1986 Rule would have little impact on this litigation because only two of the plaintiffs were parties in the state court; thus, even if jurisdiction were improper as to them, the case would continue on behalf of the remaining plaintiffs. See In re Justices of the Supreme Court of Puerto Rico, 695 F.2d 17, 26 (1st Cir.1982).[10]
 
 
 39
 As for defendants' invocation of res judicata and collateral estoppel as bars to this action, we note that the district court first rejected these claims in 1982, and that that decision was not challenged in the subsequent appeal to this court. See Romany, 742 F.2d at 37 n. 6. Nothing that has occurred either in the Puerto Rico Supreme Court or the district court since that time convinces us that we should now open up that issue for full review. Moreover, unlike jurisdiction, preclusion is a matter subject to some flexibility in application. See Berrios Rivera v. British Ropes, Ltd., 575 F.2d 966, 970 (1st Cir.1978) (Puerto Rico courts have recognized that "in certain cases, the policies of res judicata are not well served by literal application of the procedural rules of the courts.") Accordingly, without further analysis, we choose to treat the district court's 1982 ruling on preclusion as establishing the law of the case. See 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure Sec. 4478, at 801 (1981) (if a "matter is omitted from one appeal ... it may be held foreclosed on a later appeal to the same court as a matter of law of the case").[11]
 
 
 40
 Appealability. Plaintiffs contend that both the Colegio and the Secretaries filed untimely appeals from the wrong judgments. Appeals must be filed "within 30 days of the judgment or order appealed from," Fed.R.App.P. 4(a)(1), and courts of appeals have jurisdiction only over "[f]inal decisions," 28 U.S.C. Sec. 1291. Before addressing the merits of plaintiffs' argument, we review the procedural chronology.
 
 
 41
 The district court issued a full opinion on the merits on March 3, 1988, but delayed entering final judgment until after the defendants had an opportunity to modify the remedy to bring it into compliance with the court's guidelines. The defendants made no changes, and the court issued an opinion on May 27 entering judgment in accordance with the March 3 decision. That May 27 decision was formally entered on the docket on either May 31 or June 1. On June 13, the Colegio filed a motion requesting additional findings of fact, which was denied by the district court on July 15. Both the Colegio and Secretaries filed their appeals on August 10.
 
 
 42
 The Colegio appealed from the court's March 3 order and from the July 15 denial of its motion for additional findings of fact. The Secretaries' notice of appeal sought review of a June 17 judgment.
 
 
 43
 It is worth noting at the outset of our discussion that if form alone were to govern, we would have to dismiss both appeals of the merits. The Secretaries appealed from a nonexistent judgment on June 17, while the Colegio appealed from a non-final judgment--the one on March 3. It would disserve the interests of justice, however, if we dismissed the appeals on these grounds. Indeed, the Secretaries apparently made no more than a clerical mistake in referring to a June 17 judgment, which should not bar appellate review. See Foman v. Davis, 371 U.S. 178, 181, 83 S.Ct. 227, 229, 9 L.Ed.2d 222 (1962). The Colegio, while committing more than clerical error, undoubtedly appealed from the March 3 decision because it contained the district court's full analysis. With regard to both appellants, there is no doubt as to the nature of their appeals, and avoiding decision on the merits would be contrary to the spirit of the Federal Rules of Civil Procedure. Id.
 
 
 44
 As for timing, we accept the district court's conclusion that the Colegio's motion for additional findings of fact was timely,[12] extending the time for filing an appeal of the court's judgment until 30 days following the court's decision on that motion. See Fed.R.App.P. 4(a)(4) (timely motion by any party extends time for appeal). Both the Colegio and the Secretaries met that extended deadline.
 
 III. Discussion
 
 45
 We begin by stating that, in most significant respects, we agree with the district court's legal conclusions and its disposition of this case. We nevertheless write at some length so that we may respond to arguments made by both plaintiffs and defendants,[13] and so that, in some instances, we may elaborate on the district court's discussion in ways that we hope will prove helpful to defendants in administering a constitutional procedure for protecting dissenters' rights.
 
 
 46
 Our review of the Colegio system requires us to answer three primary questions: what activities may be funded with compulsory dues? does the 1986 Rule adequately protect the right of dissenters not to contribute to other activities? and what steps must defendants take to fulfill their constitutional obligations to dissenters?[14] We address each of them in turn.
 
 
 47
 A. What activities may be funded with compulsory dues?
 
 
 48
 The district court's view that an integrated bar may use compulsory dues only for activities directly related to the lawyering profession and the operation of the judicial system accords with the Supreme Court's subsequent pronouncements in Keller. See supra p. 624. To be sure, Puerto Rico's legislature and Supreme Court evidently envision purposes for the Colegio extending far beyond a "professional advisor" role. See Keller, 110 S.Ct. at 2235; Schneider, Official Translation, slip op. at 13. But even if it persuasively could be argued that lawyers in Puerto Rico play a distinctive role in creating a pluralistic society, and that collective political action by lawyers is therefore uniquely central to the mission of the Puerto Rico bar, compulsory funding of non-legal ideological activities would impose too great a burden on the First Amendment rights of individual members to be constitutionally acceptable. Lawyers who wish collectively to advocate certain political views can band together in a voluntary association, without coercing those with different views to join their ranks.
 
 
 49
 The Supreme Court cases upholding compelled membership rest on an implicit assumption that " 'the cause which justified bringing the group together,' " see Abood, 431 U.S. at 223, 97 S.Ct. at 1793 (quoting Machinists v. Street, 367 U.S. 740, 778, 81 S.Ct. 1784, 1805, 6 L.Ed.2d 1141 (1961) (Douglas, J., concurring)), would be sufficiently narrow that dissenting employees would be forced to associate against their will in only a limited way. As the district court recognized, if objecting members could be required to subsidize any activity that promoted the creation of a strongly pluralistic society, the limitation on compulsory support carved out in Abood would be meaningless.
 
 
 50
 Thus, the district court correctly set the boundaries for the Colegio's use of compulsory dues. The court also described various activities that fall within those boundaries, see supra p. 626, and we endorse its list.[15] The district court's discussion of activities, however, dwelled primarily on bar programs that we think fall at an extreme end of the spectrum, and for which there would be little dispute that compulsory financing would be appropriate. We therefore think it worth adding to its catalog both some general principles and some specific examples to assist in categorizing activities as either appropriate or inappropriate for compulsory funding.
 
 
 51
 Before we begin that list, however, it is necessary to review the United States Supreme Court's rather sketchy references to the propriety of using compulsory dues for "nongermane, nonideological expenditures," Hudson, 475 U.S. at 304 n. 13, 106 S.Ct. at 1074 n. 13. These would include, for example, the costs of members' life insurance or purely social activities. In Hudson, the most recent compulsory union dues case, the Court specifically refrained from deciding whether "the category of impermissible expenditures included all those that were not germane to collective bargaining, even if they might not be characterized as 'political or ideological,' " id. at 299, 304 n. 13, 106 S.Ct. at 1072, 1074 n. 13.[16]
 
 
 52
 In an earlier case, however, the Court had considered whether expenditures for union social activities could be financed with compulsory dues. See Ellis, 466 U.S. at 449-50, 456, 104 S.Ct. at 1893, 1896. After concluding that the Railway Labor Act permitted the union to charge all employees for such expenses, the Court only briefly addressed the First Amendment question:
 
 
 53
 Petitioners do not explicitly contend that union social activities implicate serious First Amendment interests. We need not determine whether contributing money to such affairs is an act triggering First Amendment protection. To the extent it is, the communicative content is not inherent in the act, but stems from the union's involvement in it. The objection is that these are union social hours. Therefore, the fact that the employee is forced to contribute does not increase the infringement of his First Amendment rights already resulting from the compelled contribution to the union. Petitioners may feel that their money is not being well-spent, but that does not mean they have a First Amendment complaint.[17]
 
 
 54
 466 U.S. at 456, 104 S.Ct. at 1896 (emphasis in original).
 
 
 55
 Despite the Supreme Court's reluctance in Hudson to confront the "constitutional nongermaneness question," we think the quoted discussion from Ellis provides the appropriate analysis for resolving the issue. Moreover, not only is the First Amendment not a factor, but "[t]he very nature of the free-rider problem and the governmental interest in overcoming it require that the union have a certain flexibility in its use of compelled funds." Ellis, 466 U.S. at 456, 104 S.Ct. at 1896. We therefore conclude, as did the district court, that activities incidental to the operation of an association--such as social events and the provision of insurance to members--may be financed with mandatory fees.
 
 
 56
 We now offer several other examples of expenditures that may and may not be mandatorily funded:
 
 
 57
 1. Political activities, including lobbying, may be funded from compulsory dues so long as the target issues are narrowly limited to regulating the legal profession or improving the quality of legal service available to the residents of Puerto Rico. See Keller, 110 S.Ct. at 2236-37. Thus, for example, the Colegio could lobby in favor of budget appropriations for new judicial positions or increased salaries for government attorneys, or against statutory limitations on attorney advertising or requirements for the certification of legal specialists. Cf. Gibson v. The Florida Bar, 798 F.2d 1564, 1569 & n. 4 (11th Cir.1986).
 
 
 58
 It would not be permissible, however, to use mandatory dues for such lobbying if the Colegio's position rested upon partisan political views rather than on lawyerly concerns. For example, while it would be appropriate for the Colegio generally to lobby regarding attorney advertising, it may not use mandatory dues to advocate restrictions only on advertising for legal services in aid of (or opposed to) family planning agencies or abortion clinics. It likewise would be impermissible for the Colegio to use mandatory dues to lobby on any issue pertaining to the political status of Puerto Rico, even if arguably related to the legal profession or the quality of legal services.
 
 
 59
 2. Among the activities that could not properly be funded with mandatory dues would be lobbying on controversial bills to change the law in ways not directly linked to the legal profession or the judicial system. For example, the bar could not use dissenting members' funds to promote a system of no-fault automobile insurance, endorse a pro-life amendment to the Commonwealth constitution or generate support for a death penalty. See Keller, 110 S.Ct. at 2237.
 
 
 60
 We see no problem, however, in the Colegio's participation in efforts to amend technical, non-ideological aspects of substantive law. For example, the Wisconsin state bar's 1975 legislative program included advocacy on two bills that would appear to have engendered no controversy: one making it clear that land contracts enjoy the same exemption from the Wisconsin Consumer Act as do first lien mortgages, and the other simplifying condominium transactions by abolishing a requirement that floor plans be recorded. See T. Schneyer, "The Incoherence of the Unified Bar Concept: Generalizing from the Wisconsin Case," 1983 Am.B.Found.Res.J. 1, 31 (1983) (hereinafter "Unified Bar Concept"). Another example falling into this category would be a bill to allow notaries to use either a stamp or a seal on documents. All of these measures appear politically noncontroversial and designed merely to " 'improv[e] the quality of the legal service available to the people of the [Commonwealth],' " Keller, 110 S.Ct. at 2236 (quoting Lathrop, 367 U.S. at 843, 81 S.Ct. at 1838).
 
 
 61
 3. Among the Colegio's activities that clearly fall outside the narrow categories for which financial support may be compelled are the following Colegio-sponsored committees: the Committee for the Study of the Constitutional Development of Puerto Rico from 1977 to 1984, which, among other business, has published a report on the "Procedural Requirements for Decolonization of the United Nations Organization"[18]; the Electoral Process Committee, which was created "to enhance the level of political debate in our country, to enforce compliance with the laws governing the voting process and to frame a code of ethics to regulate public debate among political candidates"; the Special Committee on Nuclear Armament and the Nuclear Arms Ban Treaty in Latin America, and the Committee for the Study of the Proposed Territorial Demarcation of the San Juan and Rio Piedras Delegations. See Schneider, Official Translation, slip op. at 48-49; 53; 54.
 
 
 62
 4. In many instances, it is likely that activities that may be subsidized with mandatory dues will be combined with those that may not. Consider, for example, a hypothetical annual meeting where business matters of direct concern to the regulation of the legal profession will be discussed, but where the chaplain opens with a long prayer for the health of Fidel Castro, and the featured speaker is a prominent Sandanista. Even if the business meeting takes two hours, and the prayer and speech together take only 35 minutes, we think it likely that the atmosphere would have become so partisan that the proportionate cost of the whole meeting should be deducted from a dissenter's dues. In other words, where the permissible and impermissible are intertwined beyond separation, the objector should be entitled to a full rebate for the cost of the function.
 
 
 63
 The district court made a similar observation with respect to the Bar's publications, holding that "[e]ach publication stands or falls ... as an indivisible entity, depending on its editorial policy." 682 F.Supp. at 686. If a magazine is devoted to educational articles about the legal profession or the quality of the legal services available in the Commonwealth, it may be funded by compulsory dues. A magazine that publishes markedly political and ideological material may not rely on that source of funding (unless, perhaps, the magazine publishes a broad spectrum of counterbalancing views).
 
 
 64
 This list, obviously, is not intended to be exhaustive, but it hopefully will provide some context within which to evaluate other activities.
 
 
 65
 B. Does the 1986 rule adequately protect the right of dissenters NOT to contribute to other activities?
 
 
 66
 It is not disputed that the Colegio regularly has engaged in activities that may not be funded with compulsory dues. Assuming that it continues to do so in the future, it must ensure that dissenters' dues are used only for activities germane to the bar's core functions or for other pursuits incidental to the operation of a bar association. The district court concluded that the procedures specified in the 1986 Rule are inadequate to accomplish that task. We agree.
 
 
 67
 Before turning to the specific procedural deficiencies of the Rule, however, we note our previous observation that there is an argument to be made that "the Colegio's penchant for ideological contention is so pervasive and unremitting ... that Puerto Rico cannot constitutionally force dissenters to join," Romany, 742 F.2d at 40-41. Although the present record leaves that argument unresolved, we are not yet prepared to hold that a rebate and escrow system to protect dissenters is necessarily unworkable. The district court believed that such a system could work and it is clear that the Colegio does engage in some activities that serve the core purposes of a bar association identified by the Supreme Court in Keller. Thus, while leaving open the possibility that no such system would suffice, our comments on the Rule are based on the assumption that it could be modified to meet constitutional requirements. But see L. Tribe, American Constitutional Law Sec. 12-4 at 805 n. 5 (2d ed. 1988) (in the case of unions, it may be preferable to require ideological activities unrelated to collective bargaining to be financed from voluntary contributions).[19]
 
 
 68
 Our view of the Rule's procedural problems coincides with that of the district court, and we therefore shall not revisit at length matters that that court already has covered well. See Schneider, 682 F.Supp. at 687-89. We emphasize, however, the Rule's two biggest procedural shortcomings: the failure to justify and support adequately an escrow percentage limited to 15% and the need for objections to specific activities as a prerequisite for refunds.
 
 
 69
 With respect to the escrow percentage, neither the Rule nor the record as a whole offers support for the 15% figure or, indeed, for any specific allocation of the amount of resources devoted to activities either entitled or not entitled to mandatory financing. Fifteen percent would seem, on its face, to be a small proportion. It is the Colegio's obligation at the outset of a dues year to categorize its activities so that an escrow amount can be based on actual anticipated expenditures for non-core activities. Although "absolute precision" in predicting plans and expenses is not required, see Hudson, 475 U.S. at 307 n. 18, 106 S.Ct. at 1076 n. 18, it is insufficient to classify activities only after a member specifically objects to financing them with mandatory dues. This would place too great a burden on members to monitor Colegio activities. See Abood, 431 U.S. at 241, 97 S.Ct. at 1802.
 
 
 70
 In addition, we reject the Colegio's challenge to the district court's imposition of a "buffer" allocation in the escrow amount, see 682 F.Supp. at 688-89. Because "absolute precision" in predicting the upcoming year's plans is unlikely, such a cushion will serve to avoid, or minimize, any First Amendment infringement resulting from a higher-than-budgeted expense for non-core ideological activities. Although the Colegio's right to use its funds freely will be compromised if the cushion turns out to be unnecessary, we think it appropriate to err on the side of protecting the First Amendment rights of the Colegio's compelled members. If, over time, it turns out that the Colegio accurately predicts the nature of its annual expenditures, it will be free to seek relief from the buffer requirement. At this time, however, we see no basis on which to second-guess the judgment that such a cushion is appropriate. The fact that the Supreme Court has not explicitly required such an amount in the past does not render it invalid.[20]
 
 
 71
 The district court also ably outlined the measures necessary to bring the Colegio into conformance with Supreme Court requirements concerning the method for objecting to expenditures. 682 F.Supp. at 689. As the district court recognized, a primary feature of a constitutional system is that dissenters be able to trigger refunds by means of general objections so that they need not make public their views on specific issues. See id. (quoting Abood, 431 U.S. at 241, 97 S.Ct. at 1802).[21] Dissenters also may not be required to explain the basis for particular objections beyond detailing why they view a disputed activity to be outside the Colegio's core functions. See Regulations Sec. 12.1, App. II at 338 ("The objection shall be raised in a brief document briefly listing the reasons on which the objection is based.")[22]
 
 
 72
 We, like the district court, decline to invalidate the use of former Justices of the Puerto Rico Supreme Court as members of the three-member Review Board that will determine which activities may be funded with compulsory dues. Plaintiffs challenge the impartiality of the Justices because of their participation in the Supreme Court's decision upholding the integrated bar and setting a wide scope for the bar's core functions. We agree fully with the district court's judgment that a panel whose members include former Supreme Court Justices "meets the requirements of an 'impartial decision-maker,' at least facially until appropriate evidence is presented to the contrary." 682 F.Supp. at 689.
 
 
 73
 C. What steps must defendants take to fulfill their constitutional obligations to dissenters?
 
 
 74
 As a result of the deficiencies it found with the Colegio's present method of operation, the district court enjoined the Puerto Rico bar association from compelling membership until it either ceased all ideological activities not germane to its core purposes or devised an adequate system to protect dissenters' rights. We find no abuse of discretion in the court's decision to impose this injunction, but for various reasons believe that its implementation should be delayed for six months while defendants work to modify their Rule. If, at the end of six months, defendants have failed to submit to the district court a rule that resolves the constitutional problems identified in its opinion and our own, and if no extension of time has been granted for cause by the district court, the injunction will take effect. During this interim period, 100% of dissenters' dues should be held in escrow, to be refunded in full if no adequate procedure is developed to protect their rights.
 
 
 75
 We have the power, under our supervisory authority, to defer effectuation of the district court's judgment. See 28 U.S.C. Sec. 2106; City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 257 and nn. 15, 16, 101 S.Ct. 2748, 2754 and nn. 15, 16, 69 L.Ed.2d 616 (1981). See also Monmouth County Correctional Inst. Inmates v. Lanzaro, 834 F.2d 326, 333 n. 10 (3d Cir.1987) (revising district court order granting preliminary injunctive relief). Our reasons for doing so in this case are these:
 
 
 76
 First, as noted above, we think there remains a good possibility that the Colegio can operate constitutionally. The Supreme Court of Puerto Rico has listed a number of useful and important functions performed by the Colegio that are directly linked to the regulation of the legal profession and improving legal services, and it appears that an accounting system now exists for determining the direct and indirect cost of any Colegio activity, see 682 F.Supp. at 688 n. 14. Thus, we think it appropriate to act on the assumption, shared by the district court, that the Colegio will be able to modify its rule to comply with Hudson.
 
 
 77
 Second, the defendants' interest in maintaining an integrated bar is sufficiently weighty that we should hesitate before halting the system completely. It seems more appropriate to allow the Colegio to continue functioning, at least temporarily, with the compelled dues of members who do not object to its activities.
 
 
 78
 Third, we think that the United States Supreme Court's recent decision on the integrated bar is likely to spur action that defendants previously may have resisted while pursuing their appeals. Before Keller, it had been nearly three decades since the Court addressed the integrated bar, in Lathrop, and the commentary since that time has questioned the nature and continuing validity of a mandatory bar. See, e.g., "Unified Bar Concept," 1983 Am.B.Found.J., at 67; C. Sorenson, Jr., "The Integrated Bar and the Freedom of Nonassociation--Continuing Siege," 63 Neb.L.Rev. 30, 31 (1983). Now that Keller has come down, defendants have an unequivocal need to change their system to ensure its continued operation.
 
 
 79
 Fourth, we recognize that changes in the Colegio system are not easily made because of the various entities involved in decision-making. The Rule was a creature of the Supreme Court, but it rests upon a foundation of information that is the Colegio's responsibility to maintain. We therefore think it appropriate to give defendants a substantial period of time to work out a constitutional approach to mandatory Colegio membership.
 
 
 80
 Finally, a federal court should endeavor to facilitate a proper objective of state and commonwealth government by constitutional means; it should, if possible, avoid frustration caused by the perhaps ill-advised strategies of counsel. Thus, while we understand the district court's inclination at this stage of the proceedings against further indulging the defendants and their lawyers, we think it is worth giving them the benefits of any doubts one more time.
 
 
 81
 Accordingly, we envision the following course of events:
 
 
 82
 --The first task is for the Colegio, or an independent agent, to perform the verified accounting required by Hudson. The resulting report should categorize activities as suitable or unsuitable for mandatory funding, consistent with the criteria described in Section A above, and the report should list the cost for each activity. This accounting should enable the Colegio to set an amount for the reduction of dues of dissenting members. This accounting should strive as much as possible to reflect reality, perhaps relying on the Colegio's actual expenditures during the last several years as the basis for the projected allocation. See Hudson, 475 U.S. at 307 n. 18, 106 S.Ct. at 1076 n. 18. And in close situations, the accounting should favor the dissenter's right not to fund programs they find offensive.
 
 
 83
 --An independent panel (perhaps the Supreme Court or the Review Board) should review the categories of activities to determine whether all items to be funded with mandatory dues are "necessarily or reasonably incurred for the purpose of regulating the legal profession or 'improving the quality of the legal service available to the people of the [Commonwealth].' " Keller, 110 S.Ct. at 2236. The panel may wish to solicit critiques and proposals from interested parties, such as plaintiffs, to ensure that the final remedy is as fully developed as possible.
 
 
 84
 --The objection procedure must be clarified or modified consistent with the district court's discussion. See supra pp. 626-27, 613.
 
 
 85
 --The new rule with relevant supporting materials, or some alternative, should be submitted to the district court for review within six months or, if a limited extension is granted, within such later period. The court must be given sufficient data to enable it to evaluate the categorization of expenses and any proposed rebate/escrow percentage. This would include, for example, copies of past Colegio budgets.
 
 
 86
 --If defendants do not modify the Colegio system within the required time, the district court's injunction will go into effect and the Colegio will be required to operate solely as a voluntary association until it stops all ideological activities outside its core purposes relating to the legal profession.
 
 IV. Stamps
 
 87
 Under Puerto Rico law, lawyers must attach notarial and forensic stamps issued by the Colegio to many official documents as a means of authenticating them and as a prerequisite to filing them in court. See P.R.Laws Ann. tit 4, Secs. 783, 785, 1006, 1038. The stamps are sold at the Commonwealth's internal revenue offices by government employees, but all proceeds are turned over to the Colegio. The Colegio is not charged for any administrative or processing costs.
 
 
 88
 The 1986 Rule stated that stamp proceeds could be used to pay for only the following items: bar members' life insurance, legal aid to indigents, legal advice to the community, processing of complaints regarding the conduct of bar members in the practice of the profession, publication of judicial opinions "and for any other purpose comprised within the duties and purposes of the Bar Association." Schneider, Official Translation, slip op. at 23. The Rule specified that the funds shall not be used for "objectionable activities."
 
 
 89
 Plaintiffs complain both about the use of their tax monies to support the Colegio, through the government's involvement in selling the stamps, and the use of the stamp fees to fund Colegio activities with which they disagree. We depart in only one respect from the district court's resolution of the stamps problem.
 
 
 90
 As that court observed, if an adequate mechanism for protecting dissenters' rights is implemented, and no revenues from the sale of stamps are used to fund activities outside the Colegio's proper core functions, no constitutional problem will remain.[23] Although there still would be disparity among lawyers in the amounts paid to the Colegio, based on their need for Colegio stamps, we see no basis for challenging the Commonwealth's arguably rational judgment to impose a larger share of the burden of funding core activities on those lawyers who use the judicial system more frequently.[24]
 
 
 91
 The district court believed, however, that if no adequate method is devised to protect dissenters' rights with respect to mandatory dues, the stamp requirements, like membership in the Colegio, must be made voluntary. The court held that restricting the use of stamp revenues to non-objectionable activities is insufficient as a solution because dissenters through their stamp purchases would then, in effect, be subsidizing ideological activities by allowing a larger portion of the voluntary dues to be used for them. We disagree. We see no difference with respect to the stamp proceeds, whether or not the Colegio can compel membership and dues, provided the stamp fees are used solely for proper core activities. In both circumstances, the Colegio has the same funds available for objectionable activities--only some portion of the dues of consenting members. Even if the Colegio chose to use all of the voluntary dues for objectionable activities, and funded its core activities solely with stamp revenues, we see no constitutional problem. The Commonwealth's decision to fund core bar association activities in that manner would put the core funding burden not on dissenters but on stamp purchasers. This allocation of burden does not implicate the First Amendment, and the Colegio therefore may collect and use the stamp fees for core activities whether or not it may compel membership.
 
 
 92
 If the Colegio should be unable to devise a satisfactory method to protect dissenters' rights, and thus be required to change to a voluntary bar, this would affect the stamp issue in one respect. If Colegio membership is voluntary and association benefits therefore do not inure to all lawyers, it would plainly be inappropriate to use stamp revenues for any activities that, while not ideological, do not directly serve the core purposes of regulating the legal profession or improving the quality of legal services. To charge nonmembers fees to help pay for members' life insurance, for example, strikes us--as it did the district court--as improper. See 682 F.Supp. at 690. In that event, the Commonwealth would be compelling certain individuals to help pay for a private benefit system for other individuals, an arrangement that triggers due process concerns if not First Amendment ones. We therefore hold that, if the Colegio becomes a voluntary association, stamp revenues may be used to finance only core activities not including "nongermane, nonideological" ones. Hudson, 475 U.S. at 304, n. 13, 106 S.Ct. at 1074, n. 13.
 
 
 93
 As a final note, if the Colegio is unable to show that stamp proceeds are, in fact, isolated from its other revenues and allocated only to appropriate activities, it would of course be barred from requiring stamp fees.[25]
 
 
 94
 With respect to the government's involvement in the sale of the stamps, we subscribe to the district court's view that no remedy is warranted. If stamp revenues are segregated appropriately, the government's assistance in selling the stamps will not support a First Amendment claim. The government simply would be involved in collecting funds that are used to promote the substantial government interests of regulating the legal profession and improving the quality of legal services available in the Commonwealth. If the Colegio cannot demonstrate that the use of stamp fees is properly limited, however, the sale of stamps would be allowed to continue only on a voluntary basis, and plaintiffs then would lack standing to challenge the government's role in the stamp program. As the district court observed, plaintiffs presumably would choose not to purchase the stamps, and their complaint therefore would depend on their status as taxpayers and the use of some portion of their tax dollar to help the Colegio finance its ideological activities.
 
 
 95
 In order to establish state taxpayer standing, plaintiffs must show that the challenged activity involves "a measurable appropriation" or loss of revenue, and "a direct dollars-and-cents injury" to themselves, Doremus v. Board of Education, 342 U.S. 429, 434, 72 S.Ct. 394, 397, 96 L.Ed. 475 (1952). See also, e.g., District of Columbia Common Cause v. District of Columbia, 858 F.2d 1, 4-5 (D.C.Cir.1988); Donnelly v. Lynch, 691 F.2d 1029, 1030-32 (1st Cir.1982), rev'd on other grounds, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984). Plaintiffs have failed to make such a showing. The stamps are sold at government offices that exist for another purpose, and plaintiffs do not allege that additional employees are hired to handle the stamp business. At best, it might be argued that there are some incidental expenses incurred by the government, but this does not constitute the "direct and particular financial interest" necessary to establish standing. Doremus, 342 U.S. at 435, 72 S.Ct. at 398.
 
 V. Damages
 
 96
 Plaintiffs contend that the district court erred in awarding each of them only $1 in nominal damages for the deprivation of their First Amendment rights. The court declined to make a higher award because " '[t]he evidence is too vague for the Court to establish through anything other than speculation, the amount of damages suffered by these Plaintiffs.' " Schneider, 682 F.Supp. at 691 (quoting Schneider, 565 F.Supp. at 979). Plaintiffs acknowledge that there was no direct proof of damages, but make an emotional appeal for financial relief in an amount reflecting the seriousness of the defendants' First Amendment violation.
 
 
 97
 We have sympathy for plaintiffs' position, and recognize the risk that nominal damages will tend to minimize the seriousness of defendants' violation and plaintiffs' injury. Nevertheless, we are unable to say the district court abused its discretion in making the $1 awards. From all that appears in the record, plaintiffs have submitted no evidence of the nature and extent of the harm they have suffered, and they have cited no precedent imposing on the court the obligation to speculate on the extent of their injury. In the absence of any proof of damages, we think the district court acted within its discretion in declining to award more than a nominal sum. See Memphis Community School Dist. v. Stachura, 477 U.S. 299, 308 n. 11, 106 S.Ct. 2537, 2543 n. 11, 91 L.Ed.2d 249 (1986) ("[N]ominal damages, and not damages based on some undefinable 'value' of infringed rights, are the appropriate means of 'vindicating' rights whose deprivation has not caused actual, provable injury.") (citing Carey v. Piphus, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978)). See also id. 477 U.S. at 315-316, 106 S.Ct. at 2547 (Marshall, J., concurring) (quoting Hobson v. Wilson, 737 F.2d 1, 62 (D.C.Cir.1984)) (injury to a First Amendment-protected interest may be compensated with substantial damages, but "only to the extent that it was 'reasonably quantifiable' ").
 
 VI. Conclusion
 We summarize our primary holdings:
 
 98
 1. The 1986 Rule was the product not of judicial decision-making but of Puerto Rico Supreme Court rulemaking, and the district court therefore had jurisdiction to review its merits. In addition, our review is barred neither by preclusion principles nor procedural defaults.
 
 
 99
 2. The Colegio may use mandatory dues and fees only for those expenditures that are "necessarily or reasonably incurred for the purpose of regulating the legal profession or 'improving the quality of the legal service available to the people of the [Commonwealth].' " Keller, 110 S.Ct. at 2236. It may, in addition, use such funds to finance activities incidental to the operation of a bar association, such as social activities and insurance programs.
 
 
 100
 3. Activities that may be funded with compulsory dues, therefore, generally must "revolve around the role of the lawyer as lawyer, rather than relying on the lawyer's more generic role as an informed and perhaps influential member of a complex society," see supra p. 626. When ideological activities outside the bar's core purposes are intertwined beyond separation with activities within them, dissenters may not be charged for any portion of the challenged program.
 
 
 101
 4. The Colegio system of mandatory membership, as defined by statute and the 1986 Rule, does not presently meet constitutional standards. It defines too broadly the range of activities that may be funded with compulsory dues. Its two primary procedural defects are the failure to support the 15% escrow amount and the provision, at least on the Rule's face, that refunds are triggered only by objections to specific activities.
 
 
 102
 5. Defendants shall have six months from the date this judgment becomes final to submit a modified version of its rule, or an alternative, to the district court, during which time 100% of dissenters' dues must be held in escrow. If, at the end of that six-month period, defendants have failed to submit to the district court a procedure for resolving the constitutional problems identified in its opinion and our own, and if no extension has been granted for cause, the injunction imposed by the district court regarding compulsory dues will take effect.[26] That injunction bars the Colegio from compelling membership until it either ceases all ideological activities not germane to its core purposes or devises an adequate system to protect dissenters' rights.
 
 
 103
 6. The Colegio may collect stamp fees so long as the funds are segregated from other revenues and used only for core purposes. Plaintiffs may not challenge the use of government facilities to sell the Colegio stamps.
 
 
 104
 7. The district court award of $1 in nominal damages to each plaintiff is affirmed.
 
 
 105
 Affirmed in part, reversed in part, modified and remanded for further proceedings consistent with this opinion. Costs to plaintiffs.
 
 
 
 *
 Of the District of Puerto Rico, sitting by designation
 
 
 [1]
 An "integrated" bar is an association of attorneys in which membership and dues are required as a condition of practicing law in the jurisdiction
 
 
 [2]
 Plaintiffs brought this action against the Colegio and the Commonwealth Secretaries of the Treasury and of Justice, and the Justices of the Puerto Rico Supreme Court, based on the alleged unconstitutionality of statutes compelling bar membership and payment of dues and stamp fees. See P.R.Laws Ann. tit. 4, Secs. 771-785, 1006, 1038. The Justices remain in the case as nominal parties only in respect to the stamp claims. See In re Justices of the Supreme Court of Puerto Rico, 695 F.2d 17, 20-27 (1st Cir.1982). Thus, the defendants appealing at this time are only the Colegio and the Secretaries
 
 
 [3]
 Like the California and Michigan bar associations at issue in Keller and Lathrop, the Colegio is an organization established by statute to regulate the legal profession and perform other functions associated with improving the administration of justice. See P.R.Laws Ann., tit. 4, Secs. 771-773. We therefore start from the proposition that the Commonwealth constitutionally may condition the right to practice law upon membership in the Colegio. See Keller, 110 S.Ct. at 2232-33 (quoting Lathrop )
 
 
 [4]
 We shall use the phrases "core purposes" or "core functions" throughout this opinion to refer to the bar's responsibility for regulating the legal profession and improving the quality of the legal service available to the people of the Commonwealth
 
 
 [5]
 In this section, and throughout Section I, we will focus entirely on the collection of mandatory dues. We will discuss the stamp issue separately below. See Section IV infra
 
 
 [6]
 In fact, the district court identified a fifth category of permissible expenditures--those without expressive content that benefit all members equally. 682 F.Supp. at 685. The Colegio, for example, provides life insurance for its members. Because these kinds of items do not infringe on members' First Amendment rights in any significant way, if at all, the court felt that they need not be strictly scrutinized. Id., citing Ellis v. Railway Clerks, 466 U.S. 435, 456, 104 S.Ct. 1883, 1896, 80 L.Ed.2d 428 (1984)
 
 
 [7]
 Although the remedy provides for a "general objection" to be filed at the beginning of the dues year, or at any time thereafter, the district court viewed the filing of a general objection merely as a "notice of the right to object," with no refund being made until the Review Board adjudicates specific objections. See Schneider, Official Translation, slip op. at 22 (Sec. C(3)(e)) and Regulations at Articles 11 and 13, App. II at 337, 340
 At oral argument, defendants claimed that once any type of objection is made--general or specific--the independent review panel must review all Colegio activities and expenditures in order to determine which were objectionable. Those making general objections would receive a full refund for all objectionable activities, whether or not there had been a specific objection.
 We note, however, that neither the 1986 Rule nor the regulations adopted to implement it include a provision for refunds in the absence of specific objections. Thus, on their face, the Rule and regulations seem to operate as the district court described.
 
 
 [8]
 At oral argument, the attorney for defendant Colegio stated that numerous documents, many of which had been generated for the state court proceeding that led to creation of the 1986 Rule, had been offered to the district court but were never admitted into evidence. We obviously do not know the nature of the information contained in those materials, and we have no basis for questioning the district court's apparent conclusion that the offered documents would not have resolved its questions concerning the Rule
 
 
 [9]
 The district court observed that the apparent factual inconsistency between its findings of "pervasive and continuous" ideological activities by the Colegio, 682 F.Supp. at 678; 565 F.Supp. at 965, and the Commonwealth court's finding that such activities were de minimis was attributable, "at least in part, to a different conception of what are ideological activities." 682 F.Supp. at 678 n. 3
 The court also suggested that the Commonwealth Supreme Court's findings were inconsistent with the Colegio's stipulation "that activities similar in nature to those undertaken by the Colegio prior to 1983 [and listed by the district court in its 1983 opinion, 565 F.Supp. at 966-971] have continued," 682 F.Supp. at 678 & n. 3. We note, however, that the Colegio's stipulation acknowledges only that certain types of activities have continued, and not that those activities constituted a substantial portion of all Colegio pursuits.
 
 
 [10]
 Defendant Colegio claims that, if the 1986 Rule was the product of a regulatory rather than an adjudicative process, then plaintiffs should have amended their complaint to seek review of an administrative act and the district court should have reviewed the rule under the substantial evidence test that is used for agency decisionmaking. This argument is without merit. The district court had no jurisdiction to conduct an administrative review of the 1986 Rule. It considered the Rule's content as part of plaintiff's claim that the Colegio mandatory membership system violates the First Amendment. The question before the district court was not whether there was substantial evidence to support the Rule, but whether the Rule modifies the compulsory Colegio system specified by statute so that that system meets constitutional requirements
 The Colegio also argues that the Supreme Court Justices should have been brought in as parties if the validity of a "rule" were at stake. Although the Justices originally were full defendants and remained as nominal parties with respect to the stamp claims, we ordered dismissal of the claims against the Justices in 1982 "insofar as they involve Puerto Rico's system of compulsory bar membership and compulsory payment of bar dues." See In re Justices, 695 F.2d at 20-25, 27. At that time, the compulsory membership and dues claims involved only the statutes creating and regulating the Colegio. The Colegio is correct that the Justices are now appropriate parties in the dues claim because of their promulgation of the 1986 Rule. Id. at 23. We fail to see, however, how this fact affects the validity of either the district court's judgment or our own. The Colegio and Secretaries have defended the 1986 Rule on the merits, and the Colegio presumably has the ability to ensure that the Rule is refined in the ways required by our opinions. If not, plaintiffs' rights will be effectively protected by the district court's injunction against the Colegio and the Secretaries.
 
 
 [11]
 As with the Rooker doctrine, res judicata and collateral estoppel would not, in any event, apply to plaintiffs Romany, Souss and Oreste Ramos Diaz because they were not parties on the merits in the Commonwealth litigation. Although defendants attempt to characterize them as having withdrawn from the Commonwealth case, and the Supreme Court in its 1986 ruling refers to a motion on their behalf "to be relieved from further participation in the case," Schneider, Official Translation, slip op. at 5, we fail to see how they were parties in the first place
 In addition, the rulemaking aspects of the Puerto Rico case, including the Supreme Court's factfinding on the nature and extent of the Colegio's "objectionable" activities, do not implicate preclusion principles because they were not "judicial proceedings" entitled to full faith and credit. See 28 U.S.C. Sec. 1738.
 Thus, the potential scope of preclusion in this case is quite narrow, and even had defendants preserved and prevailed with this defense against plaintiffs Schneider and Ramos, our opinion would have differed only with respect to their individual entitlements to damages.
 
 
 [12]
 Plaintiffs argue at length about whether the official entry of judgment for the May 27 decision occurred on May 31 or June 1. Regardless of the correct date, we would not reject as untimely an appeal that is dependent on the later date because of the legitimate confusion over which date the judgment was entered
 
 
 [13]
 Both plaintiffs and defendants filed appeals in this case. Defendants claim that the district court erred in concluding that the 1986 Rule fails to meet constitutional requirements. Plaintiffs claim that the court erred in finding that they do not have standing to challenge the government's involvement in collecting Colegio stamp fees, in awarding them only nominal damages and in approving certain aspects of the 1986 Rule
 
 
 [14]
 Throughout the discussion section, our assumption is that defendants would choose to modify the 1986 Rule so that it meets constitutional requirements rather than to design a completely new procedure for protecting dissenters' rights. Defendants are, of course, free to tackle such a project if so inclined. See Keller, 110 S.Ct. at 2237-38 (leaving open the possibility that procedures different from those described in Hudson could satisfy an integrated bar's obligation to dissenters)
 
 
 [15]
 We note that most of the activities listed as non-objectionable by the Puerto Rico Supreme Court, and restated in regulations issued by the Review Board, see App. II at 331-334, are within the court's acceptable range. These are described by the regulations as "[a]ctivities closest related to the practice of law and the administration of justice." Id. at 331
 
 
 [16]
 A majority of the Court of Appeals in Hudson had addressed that issue, and concluded that compulsory dues could not be used for such purposes. See 743 F.2d 1187, 1194 (7th Cir.1984). The Supreme Court saw no need to reach the question, however, because the plaintiffs' challenge was to the procedure used to protect dissenters' rights and not to particular expenditures. The Court felt that the procedural requirements would be the same regardless of the outcome of the "constitutional nongermaneness question." 475 U.S. at 304 n. 13, 106 S.Ct. at 1074 n. 13
 
 
 [17]
 Although the plaintiffs in Ellis also challenged mandatory funding of the union's death benefits program, the Court found it unnecessary to reach that issue because the union was no longer the exclusive bargaining agent for the plaintiffs and so they no longer were involved in the death benefits system
 
 
 [18]
 The Puerto Rico Supreme Court described the work of this committee as follows:
 The Committee for the Study of the Constitutional Development is constituted by attorneys from all political stands. Among the studies it has conducted, the most important are: police corruption as a threat to the democratic system, the electorate's direct means of intervention in the political process. And the third one is the result of a series of reports on the Puerto Rican status issue. One of the reports, which was unanimously approved by the members of the Committee, recommends some minimum requirements that should be guaranteed under any status alternative. Based on these reports, the President of the Bar Association has appeared before the United Nations to present the recommendations of the Committee.
 Schneider, Official Translation, slip op. at 36 (citations omitted).
 
 
 [19]
 We also leave open, as did the Supreme Court in Keller, see 110 S.Ct. at 2238, the alternate possibility that the Colegio should be enjoined permanently from using its name to advance political or ideological causes beyond those for which mandatory financing is permissible
 
 
 [20]
 Moreover, such a cushion is not unprecedented. The Chicago Teachers Union rounded up its estimate for expenditures unrelated to collective bargaining and contract administration in establishing a dissenters' rebate to provide a cushion to cover inadvertent errors. See Hudson, 475 U.S. at 295, 106 S.Ct. at 1070
 
 
 [21]
 As noted above, it may be that defendants intend that the procedure operate in this fashion, in other words, that a general objection lodged at the beginning of the dues year automatically will entitle that dissenter to a full rebate for the amount spent on all activities unconnected with the Colegio's core purposes. See supra n. 7
 
 
 [22]
 Thus, one way for an objection procedure to work would be for the Colegio to provide members at the beginning of the dues year with a proposed budget that classifies activities as appropriate or inappropriate for mandatory financing. Based on that classification, the budget would include an escrow percentage for dissenters' dues. Members who filed a general objection at the beginning of the year would trigger an escrow contribution on their behalf and ultimately would be entitled to a rebate for all activities listed as inappropriate for mandatory financing. In addition, members must be able to challenge the placement of particular activities within the "nonobjectionable" category. Moreover, the Colegio has the obligation to adjust the refund amount during the year based on actual expenditures
 
 
 [23]
 It seems that a proper approach to the budgeting process would be to deduct, at the outset, the amount of the stamp revenues from the total estimated funds needed by the Colegio for core activities. It would then be possible to calculate the additional amount needed from dues to fund the remainder of the bar's budget, broken down into the amount needed to fund core activities and the amount needed to fund all other activities. Dissenters would be entitled to a rebate or dues reduction for the portion of dues assessed for all non-core activities
 
 
 [24]
 It is not the case, as plaintiffs argue, that dissenting attorneys who purchase a large number of stamps will be improperly subsidizing the Colegio's non-core activities through their stamp fees. Assuming a constitutional dues procedure is implemented, the Colegio will be required to specify the cost of its non-core activities, and those items will be funded only by means of the portion of mandatory dues that dissenters will not be charged
 Although it is true that any amount raised through stamps will not need to be raised through dues, this is not the sort of bookkeeping deception rejected by the Supreme Court in Abood, 431 U.S. at 237 n. 35, 97 S.Ct. at 1800 n. 35. The court there was referring to a system in which all members are charged the same fee but dissenting members' payments are allocated only to core purposes while other members' payments could be used for any purpose. In those circumstances, where there is no discount for dissenters, dissenters would pay more than their pro rata share of core expenses. That sort of disparity differs from the disparity in attorney purchases of Colegio stamps because the stamp fees paid by all lawyers, dissenting or not, receive identical treatment. Unless it were shown that, as a rule, dissenting attorneys used substantially more stamps than non-dissenting ones, there is no disproportionate burden placed on dissenting attorneys for the funding of Colegio core activities. There is therefore no First Amendment violation.
 
 
 [25]
 For the six-month interim period, all stamp revenues, like dissenters' dues, should be placed in escrow. Defendants may, however, ask the district court to lift this requirement before the dissenters' remedy is modified upon a showing that stamp fees are fully segregated and used only for core activities
 
 
 [26]
 We expect that defendants immediately will begin a good-faith effort to revise the Colegio's compulsory membership system, and will submit their proposal to the district court as soon as possible. We further expect that the district court will need a period of time to review that proposal. We do not intend that the injunction take effect during the review so long as it appears that defendants have made a good-faith effort to fulfill their constitutional obligations to plaintiffs. We leave it to the district court to determine when, if at all, the injunction should take effect after the six-month delay