**Robert E. GIBSON, Plaintiff-Appellant,**

v.

**THE FLORIDA BAR and Members of the Board of Governors, Defendants-Appellees.**

No. 85-3711.

United States Court of Appeals, Eleventh Circuit.

Sept. 15, 1986.

Herbert R. Kraft, Tallahassee, Fla., for plaintiff-appellant.

Rayford Taylor, Barry Richard, Tallahassee, Fla., for defendants-appellees.

Before HILL, Circuit Judge, HENDERSON,* Senior Circuit Judge, and LYNNE**, Senior District Judge.

LYNNE, Senior District Judge:

### I.

In this constitutional challenge to the lobbying activities of the Florida Bar, plaintiff Robert E. Gibson contends that the Bar violated his first amendment rights of free speech and association by spending compulsory bar dues to espouse political and ideological positions. The district court found that the Bar's stated purpose of improving the administration of justice served as a sufficiently important governmental interest to justify the intrusion upon Gibson's rights caused by the Bar's Legislative Program. We reverse, holding that certain positions taken by the Bar are not sufficiently germane to its administration-of-justice function to justify the expenditure of compulsory dues.

### II. FACTUAL AND PROCEDURAL BACKGROUND

The Florida Supreme Court, pursuant to Article V, Section 15 of the Florida Constitution, has exclusive jurisdiction to regulate the admission to practice and discipline of attorneys. The court has mandated that, in order to practice law in Florida, one must be a member in good standing of the Florida Bar, which in turn requires the payment of annual dues. *See Integration Rule of the Florida Bar*, Articles II, VIII. In the Integration Rule, the supreme court delineates the purposes of the Bar as threefold: "to inculcate in its members the principles of duty and service to the public, to improve the administration of justice, and to advance the science of jurisprudence." *Id.*

The Bar engages in a Legislative Program in which it lobbys before the Florida Legislature and takes official positions on various public issues.[1] The Bar has adopted Standing Board Policy 900, which sets forth regulations and procedures by which the Bar takes positions on ballot questions and legislative matters. Under Policy 900, either the Bar's Legislation

---

* *See* Rule 3(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

** Honorable Seybourn H. Lynne, Senior U.S. District Judge for the Northern District of Alabama, sitting by designation.

1. In addition to traditional legislative lobbying measures, the Bar promulgates its political and ideological positions through official Bar publications and speeches by Bar officials. The record demonstrates that the Bar has espoused the following positions: (1) opposed tort reform; (2) opposed limitation of damages in medical malpractice actions; (3) opposed changes in the state sales tax; (4) opposed changes in the state's taxation and venue powers; and (5) advocated regulation of child care centers.

Committee or Executive Committee considers an issue and determines whether its subject matter is within the scope of the Bar's authority as set forth in its Rules and By-Laws. If so, the committee then determines by majority vote what position the Bar should adopt with respect to that issue. The Bar Board of Governors then considers the recommendation of the committee and determines the official Bar position.

Appellant Robert E. Gibson is a member in good standing of the Florida Bar. Gibson actively and financially supported a campaign on behalf of "Proposition One," a ballot question seeking limitation of government revenue that eventually was stricken from the ballot. When the Bar publicly announced its opposition to Proposition One, Gibson filed this action for declaratory and injunctive relief, claiming that the Bar's use of compulsory dues constituted a violation of his first amendment rights of free speech and association. Gibson contended that the first amendment prohibited the use of compulsory dues to advocate any position on any matter other than direct advocacy to a judicial body. The case was tried before the district court, which entered a judgment in favor of the Bar. The district court held that the Bar's administration-of-justice function was "a 'sufficiently important' state interest to justify the degree of intrusion into plaintiff's rights occasioned by the Bar's legislative program." This appeal followed.

## III. DISCUSSION

At the heart of this appeal is the appellant's contention that his rights of free speech and association have been infringed by the Bar's use of compulsory dues to espouse political and ideological positions with which the appellant does not agree.[2] The legal underpinnings necessary to resolve this question are derived from a series of United States Supreme Court cases, one of which upholds the constitutionality of the integrated state bar, and others which involve the closely analogous situation where union members are forced to financially support union lobbying measures through compelled membership dues or agency shop fees.

### A. Constitutionality of Compulsory Membership Dues

In *Lathrop v. Donahue*, 367 U.S. 820, 81 S.Ct. 1826, 6 L.Ed.2d 1191 (1961), the Court addressed the question of the constitutionality of the Wisconsin integrated bar. Six members of the Court agreed that, when its membership requirement was limited to the compulsory payment of reasonable annual dues, Wisconsin's integrated bar caused no "impingement upon protected rights of association." 367 U.S. at 843, 81 S.Ct. at 1838. *Lathrop* stopped short, however, of a resolution of the very issue before this court: whether the use of dues money to support political activities of the state bar infringed upon constitutional rights of free speech. The plurality opinion of the Court concluded that the record in *Lathrop* provided no sound basis for deciding this additional constitutional challenge.[3]

2. "Among the rights protected by the First Amendment is the right of individuals to associate to further their personal beliefs." *Healy v. James*, 408 U.S. 169, 181, 92 S.Ct. 2338, 2346, 33 L.Ed.2d 266 (1972). "[F]reedom to associate with others for the common advancement of political beliefs and ideas is a form of 'orderly group activity' protected by the First and Fourteenth Amendments." *Kusper v. Pontikes*, 414 U.S. 51, 56–57, 94 S.Ct. 303, 307, 38 L.Ed.2d 260 (1973).

A state may restrict the speech of a private person only when the restriction is a precisely drawn means of serving a compelling state interest. *Consolidated Edison Co. v. Public Service*

*Comm.*, 447 U.S. 530, 540, 100 S.Ct. 2326, 2334 (1980).

3. In his concurring opinion, Justice Harlan strenuously contended that because it was not unconstitutional to require the payment of dues, it could not be unconstitutional for a state bar to use such funds to fulfill a basic purpose for which the bar was established. Assuming that there existed some valid distinction between free association and free speech rights in the context of an integrated bar, Justice Harlan stated that the integrated bar did not divest Wisconsin lawyers of the freedom of individual thoughts, speech, and association. (P. 881) The concurrence went on to state that the state

Admittedly, *Lathrop v. Donahue* offers little, if any, specific guidance on the first amendment rights at issue in this appeal. *See Abood v. Detroit Board of Education,* 431 U.S. at 233, n. 29, 97 S.Ct. at 1798 n. 29. Unfortunately, *Lathrop* is the last Supreme Court decision squarely to address the first amendment rights of lawyers in an integrated bar. For additional illumination in this area, we must turn to the closely related situation where employees are required by law to contribute funds to labor unions, which in turn use some portion of those funds for political activities similar to the Florida Bar's legislative program. The close connection between these two groups was recognized in *Railway Employes' Dept. v. Hanson,* 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956), when the Court held that the first amendment did not excuse employees from government-sanctioned, compelled membership in a union as a condition of continued employment. *Hanson* recognized that compelled union dues do infringe upon first amendment rights, but held that Congress' desire to promote collective bargaining was a sufficiently compelling governmental interest to justify such an infringement. When explaining its justification of compulsory union dues, the Court alluded to the integrated bar as an *a fortiori* example of a type of required membership that passes constitutional muster. 351 U.S. at 238, 76 S.Ct. at 721.

In *International Machinists v. Street,* 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961), the Court considered a related issue also arising out of union membership required by the Railway Labor Act: whether compelled union dues could be used to finance election campaigns and lobbying activities. The Court avoided deciding this challenge on a constitutional basis, holding that the Act prohibited the use of compulsory dues for political purposes. 367 U.S. at 768, 81 S.Ct. at 1799.

## B. Use of Compulsory Fees for Political Purposes

In *Abood v. Detroit Board of Education,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), the Court faced a challenge to an agency shop agreement under which all teachers who failed to join the union were required to pay the union a service fee equal to the regular dues amount. *Abood* followed the rationale of *Hanson* and *Street, supra,* holding that the government's interest in promoting collective bargaining and discouraging "free riders," (employees who benefit from union representation without contributing financially), justified the agency shop agreement in question. The Court continued, however, to address the issue it chose to avoid in *Hanson, Lathrop,* and *Street:* whether fees compelled by law as a condition of continued employment could be used for political and ideological purposes.

*Abood* first observed that former Supreme Court decisions "established with unmistakable clarity that the freedom of an individual to associate for the purpose of advancing beliefs and ideas is protected by the First and Fourteenth Amendments. [citations omitted] ... [C]ontributing to an organization for the purpose of spreading a political message is protected by the First Amendment." 431 U.S. at 233, 97 S.Ct. at 1798. The Court further held that any "limitations upon the freedom to contribute implicate fundamental First Amendment interests," (citing *Buckley v. Valeo,* 424 U.S. 1, 23, 96 S.Ct. 612, 636, 46 L.Ed.2d 659 (1976), and stated that compelled contributions caused no less an infringement upon constitutional rights than prohibited contributions. *Id.* 431 U.S. at 234, 97 S.Ct. at 1799. The *Abood* court concluded that a union may not spend compelled fees for the advancement of political views or ideological causes that are not incidental to the union's role as bargaining unit. *Id.* at 235, 97 S.Ct. at 1799. Stated another way, "*Abood* held that employees may not be

interest in an integrated bar is "sufficiently important to justify whatever incursions on these individual freedoms may be thought to arise"

from the compulsory dues requirement. (P. 861)

compelled to support a union's ideological activities unrelated to collective bargaining. The basis for the holding that associational rights were infringed was the compulsory collection of dues from dissenting employees." *Minnesota Board for Community Colleges v. Knight,* 465 U.S. 271, 291, n. 13, 104 S.Ct. 1058, 1070 n. 13, 79 L.Ed.2d 299 (1984).

### C. *Applying Abood to the Florida Bar*

██ At the risk of oversimplification, *Abood* may be read to say that compulsory union or agency shop fees may not be spent on lobbying or ideological activities that are not germane to the purpose that brought the union together in the first place. *See Ellis v. Railway Clerks,* 466 U.S. 435, 447, 104 S.Ct. 1883, 1891, 80 L.Ed. 428, 447 (1985). As stated *supra,* the Supreme Court has referred to the similarity between union dues and bar dues, *see Railway Employes' Dept. v. Hanson,* 351 U.S. at 238, 76 S.Ct. at 721; *Abood v. Detroit Board of Education,* 431 U.S. at 233, 97 S.Ct. at 1798, and the two situations are very similar. Both the union employee and the integrated bar member are required by law to pay a fee. Both individuals' funds are then spent by an organization with an interest in altering the political process to its advantage. Both the union and integrated bar are occupationally homogeneous. Both groups elect representatives who are supposed to represent the entire group. Finally, both groups are comprised of members who often disagree on matters of public interest.

A distinction does arise, however, in the character of the entity to which the compelled funds must be paid. On one hand, Congress has recognized the importance of collective bargaining and the need for unions to avail themselves of the political process in the representation of their members. *See Hanson, supra* at 238, 76 S.Ct. at 721. In this respect, the union's need to undertake political activities is more of a necessary consequence of the collective bargaining system than an independent, compelling interest. On the other hand,

the integrated Bar has been recognized by the State as possessing special training and experience with which to serve in an advisory function to the various branches of state government and to help "improve the administration of justice." While this advisory function is not the Bar's only function or even its most important function, the Bar's capacity and responsibility to advise and educate gives rise to a compelling governmental interest distinct from that of the labor union.

Justice Harlan, in his concurring opinion in *Lathrop v. Donahue, supra,* seized upon this distinction to support his contention that an integrated bar was conceptually no different than an appointed advisory board whose dissenting individual members would have no first amendment right to squelch such a board's majority recommendation. *See Lathrop,* 367 U.S. at 861, 81 S.Ct. at 1847. Because Florida has recognized the Bar as an arm of the judiciary, *see In re Amendment to the Integration Rule of the Florida Bar,* 439 So.2d 213, 214 (Fla.1983), this argument has some appeal. Justice Powell's concurrence in *Abood,* however, provides a more persuasive distinction between compelled support of government and a private group:

> Compelled support of a private association is fundamentally different from compelled support of government....

> [T]he reason for permitting the government to compel the payment of taxes and to spend money on controversial projects is that the government is representative of the people. The same cannot be said of a union, which is representative only of one segment of the population, with certain common interests. The withholding of financial support is fully protected as speech in this context.

431 U.S. at 259, n. 13, 97 S.Ct. at 1811 n. 13. Under this analysis, the Bar's interests are closely aligned with those of a labor union, and its lobbying activities are more accurately viewed as partisan politics than the supposedly impartial recommendation of a governmental entity.

We conclude, therefore, that the difference between the union and the integrated bar is so small that the rationale of the *Abood* case is very appropriate. *See Keller v. State Bar of California*, 181 Cal. App.3d 471, 226 Cal.Rptr. 448 (3d App.Dist. 1986). The similarities between union dues and integrated bar dues are so substantial that we may safely transpose the *Abood* holding to the facts presented in this appeal as follows: the Florida Bar may use compulsory Bar dues to finance its Legislative Program only to the extent that it assumes a political or ideological position on matters that are germane to the Bar's stated purposes.

■ Obviously, the recitation of this simplistic rule will be of little assistance when one of the purposes of the Bar is the amorphous "administration of justice." Transposition of the *Abood* rationale to the integrated bar works well conceptually, but the practical reality of applying that rationale is not so easy. All first amendment challenges are analyzed under a two-part test that requires a "compelling interest" and the "least restrictive means" of achieving that interest. *E.g., Chicago Teachers Union v. Hudson*, 475 U.S. ——, ——, 106 S.Ct. 1066, 89 L.Ed.2d 232, 245 (1986). *Abood* did nothing more than identify a proper "compelling interest" for the first step of this analysis. *Abood* did not vitiate the "least restrictive means" criterion; the Court merely defined one exceptional circumstance when compelled fees may be used to advocate views inimical to the beliefs of some union members. Wooden application of the *Abood* rule could arguably extend unlimited discretion to the Bar under its administration-of-justice function.

■ Accordingly, it is apparent that too much weight was given at the trial level to the Bar's compelling interest argument and not enough attention was focused upon whether the Legislative Program was conducted in the least restrictive manner

available to the Bar. The evidentiary record in this appeal does not enable us to make a definitive decision on whether certain positions taken by the Bar were sufficiently related to its basic function to justify the expenditure of compulsory dues. Nor does the opinion of the trial court adequately identify specific actions taken by the Bar's Legislative Program. Indeed, the decision below was based on a review of the Bar's Policy 900, rather than analysis of past Bar positions. In an action such as this, where specific actions are challenged as contrary to the first amendment, it is not sufficient to assess the rules and procedures by which those actions were taken. The proper focus in this action should be upon the actual results of the Bar's Legislative Program, *i.e.,* whether past positions of the Bar were sufficiently related to its purpose of improving the administration of justice. On this issue, the Bar bears the burden of proving that its expenditures were constitutionally justified. *See Chicago Teachers Union, supra,* at ——, 106 S.Ct. at 1074, n. 11, 89 L.Ed.2d at 245, n. 11.

■ Although further findings of fact are necessary to resolve this dispute, some discussion of appropriate Bar lobbying issues is warranted. Uncertainty and disagreement over what is a proper issue for Bar lobbying are the reasons for this dispute and for our reversal of the trial court. In such a situation, some guidance is necessary to help draw the inevitably fine lines that will arise in these cases. The Bar should construe "improving the administration of justice" as pertaining to the role of the lawyer in the judicial system and in society. The collective expertise of lawyers is grounded in their long-standing relationship with the courts. Lobbying activities that infringe upon individual rights should relate directly to that expertise.[4]

It should be stressed that this opinion addresses only the use of compelled fees by

---

**4.** Acceptable areas for Bar lobbying would include the following topics: (1) questions concerning the regulation of attorneys; (2) budget appropriations for the judiciary and legal aid;

(3) proposed changes in litigation procedures; (4) regulation of attorneys' client trust accounts; and (5) law school and Bar admission standards.

the Bar. *Abood* specifically noted that the union was free to politicize on *any* issue of interest to that group. *See* 431 U.S. at 235, 97 S.Ct. at 1799. Only the use of compelled funds was prohibited for issues unrelated to collective bargaining. *Id.* Similarly, the Bar may speak as a group on any issue as long as it does so without using the compulsory dues of dissenting members.[5]

## IV.

This action is therefore REVERSED and REMANDED to the district court for further proceedings consistent with this opinion.

---

**5.** Although the question of proper remedy is not before this court, this aspect of the *Abood* opinion suggests that the difficult task of discerning proper Bar position issues could be avoided by one of two methods: (1) a voluntary program in which lawyers would not be compelled to finance the Legislative Program, but could contribute towards that program as they wished; or (2) a refund procedure allowing dissenting lawyers to notify the Bar that they disagree with a Bar position, then receive that portion of their dues allotted to lobbying. [According to testimony at trial, each lawyer's share of the lobbying budget amounts to approximately $1.50]. Lawyers would only have to notify the Bar of a general disagreement, since the first amendment also protects an individual's right *not* to disclose his beliefs. *See Abood, supra,* at 241, n. 42, 97 S.Ct. at 1802, n. 42.