Thomas L. POPEJOY, Jr.,
et al., Plaintiffs,

v.

NEW MEXICO BOARD OF BAR
COMMISSIONERS, et al.,
Defendants.

Civ. No. 92–1462 JB/LH/LFG.

United States District Court,
D. New Mexico.

May 17, 1995.

Richard Rubin, Santa Fe, NM, William Walker, Walker & Van Heijenoort, Albuquerque, NM, for plaintiffs.

Andrew G. Schultz and Charles K. Purcell, Rodey, Dickason, Sloan, Akin & Robb, P.A., Albuquerque, NM, for defendants.

### MEMORANDUM OPINION

HANSEN, District Judge.

THIS MATTER comes before the Court[1] on Plaintiffs' third motion to enforce judg-

---

1. This case was originally assigned to the Honorable Juan G. Burciaga, Senior Judge, United States District of New Mexico. Judge Burciaga died on March 5, 1995. Subsequently, this case was transferred to Judge C. LeRoy Hansen of the United States District of New Mexico.

ment and to vacate the decision of the impartial decisionmaker, filed August 22, 1994 (Docket No. 78), Plaintiffs' motion to reconsider the Court's memorandum opinion and order of August 24, 1994, filed September 8, 1994 (Docket No. 85), and Defendants' motion to dismiss, filed July 28, 1994 (Docket No. 73). Having reviewed the submissions and arguments of the parties, and having thoroughly considered the applicable law in this matter, the Court concludes that Plaintiffs' third motion to enforce judgment is not well taken and is denied; that Plaintiffs' motion to reconsider is well taken and is granted but, as explained below, only to the extent of amending, and not overruling, the August 24, 1994 memorandum opinion and order; and that Defendants' motion to dismiss is well taken and is granted.

Plaintiffs are members of the New Mexico State Bar (the "Bar") who brought this action to force the Bar to disclose past expenses and future proposed budgets as required by the First Amendment. At stake is the ability of dissenting members of the Bar to object to expenditures for political or ideological activities not germane to the Bar's purposes of regulating the legal profession or improving the quality of legal services. On August 26, 1993, Judge Burciaga entered a memorandum opinion and order critical of the Bar's disclosure practices. *Popejoy v. New Mexico Bd. of Bar Commr's*, 831 F.Supp. 814, 818–20 (D.N.M.1993). Specifically, Judge Burciaga found that the Bar failed to comply with *Chicago Teachers Union v. Hudson*, 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986) and *Keller v. State Bar of California*, 496 U.S. 1, 110 S.Ct. 2228, 110 L.Ed.2d 1 (1990). *Popejoy*, 831 F.Supp. at 819–21. Judge Burciaga consequently ordered the Bar to comply with the strictures of *Hudson* and *Keller. Id.* at 821.

Pursuant to Judge Burciaga's order, the Bar provided to all members an accounting of the major categories of the Bar's expenditures for 1991 through 1993 and for the proposed 1994 budget. The Bar categorized those expenditures into what it believed were chargeable, that is, expenses of a non-ideological nature germane to the Bar's purposes, and non-chargeable expenses. The Bar concluded that all expenditures for fiscal years 1991, 1993, and 1994 were chargeable. For 1992, the Bar determined that expenditures for a Muscular Dystrophy Association fundraising golf tournament, sponsored by the Young Lawyers Division, were not germane. The Bar classified these expenses as *de minimis,* however, and did not provide a refund. The Bar hired an independent auditor to verify that the classification of expenses was accurate.

On January 25, 1994, Judge Burciaga, dissatisfied in part with the Bar's disclosure efforts, directed the Bar to allocate expenditures it classified as "Administrative Office Salaries" to specific program activities, to identify expenses incurred for lobbying, public relations and charitable activities, and to institute a time-keeping system for Bar employees. *Popejoy v. New Mexico Bd. of Bar Commr's*, 847 F.Supp. 155, 157–59 (D.N.M. 1994). For the years 1991 to 1993, the Bar had not kept accurate time records of exactly how Bar employees spent their time on certain activities. The Bar responded to Judge Burciaga's January 25, 1994 order by allocating salary overhead on a *pro rata* basis, a practice that, coincidentally, the California State Bar employs. In all other respects, the Bar complied with Judge Burciaga's January 25, 1994 order.

Subsequently, the Bar provided members with an opportunity to challenge any prior or proposed expenditures, and allowed for an impartial decisionmaker to address those objections the Bar refused to accept. The New Mexico Supreme Court appointed Frank X. Gordon, Jr., former Chief Justice of the Arizona Supreme Court, to hear and determine the validity of the objections. Some members objected to all past expenditures, even those clearly chargeable, and demanded a complete refund of all dues paid from 1991 to the present. After notice by publication, Justice Gordon received evidence and heard argument on April 25 and 26, 1994. During these proceedings, no one appeared as counsel for any of the challengers and only one Plaintiff, Thomas L. Popejoy, appeared to give a brief opening statement; for the most part, then, only the Bar presented substantial evidence and argument. On June 29,

1994, Justice Gordon issued his decision, which was later published in the New Mexico Bar Bulletin. With the exception of monies spent on the golf tournament, Justice Gordon found all expenses to be chargeable to the membership.

On August 24, 1994, Judge Burciaga considered Plaintiffs' second motion to enforce the Court's January 25, 1994 judgment. *Popejoy v. New Mexico Bd. of Bar Commr's*, Civ. No. 92–1462 JB, Mem. Op. and Order, 1994 WL 823551 (D.N.M. filed Aug. 24, 1994). In that motion, Plaintiffs argued that the Bar's utilization of a *pro rata* allocation of salary overhead did not meet the dictates of *Hudson*. *Id.* at 2. Judge Burciaga ruled that Plaintiffs bore the burden of proving that the Bar's expenditures were non-germane, and because they failed to present substantial evidence during the April 25 and 26 proceedings, they failed to satisfy this burden. *Id.* at 4 and n. 1. Judge Burciaga implied that the Bar's allocation of overhead "does not change the potential for abuse." *Id.* at 3. However, because Judge Burciaga believed Plaintiffs had failed to prove their damages, he did not expressly strike down the Bar's allocation method. *Id.* at 4.

Three dispositive motions are now pending. Plaintiffs' motion to reconsider relates to Judge Burciaga's August 24, 1994 order. Plaintiffs assert that Judge Burciaga erred in imposing upon them the burden of proof, and they request a complete refund of all dues paid because of the Bar's failure to maintain adequate time records. In this motion, Plaintiffs additionally contend that the decisionmaker erred in concluding that certain expenditures were chargeable, specifically, expenses incurred in relation to certain lobbying activities and to the Bar's "Task Force to Assist Gulf Military Personnel and Families." In Plaintiffs' third motion to enforce the Court's judgment and to vacate the decision of Justice Gordon, Plaintiffs argue that the decisionmaker used the wrong standard to gauge chargeability and as a result, reached erroneous decisions. In particular, Plaintiffs contend that charges with respect to the construction of the new State Bar Center and for defending against the present litigation should not be imposed upon the members. Finally, Defendants filed a motion to dismiss based on their contention that they have fully complied with the Court's orders and hence no reason exists for maintaining jurisdiction over the present action.

The Court will discuss, first, the standard Justice Gordon employed and the merits of his findings regarding those expenditures to which Plaintiffs voiced specific objections, and second, Judge Burciaga's August 24, 1994 memorandum opinion. The Court will next address a matter that Judge Burciaga took under advisement but never resolved, namely, whether Justice Gordon was properly named as an independent and impartial decisionmaker.

## I. THE IMPARTIAL DECISIONMAKER'S FINDINGS

### A. JUSTICE GORDON'S STANDARD OF CHARGEABILITY

Plaintiffs take issue with the test Justice Gordon employed to ascertain whether a given expenditure was chargeable to the membership. Plaintiffs derive from *Lehnert v. Ferris Faculty Ass'n*, 500 U.S. 507, 111 S.Ct. 1950, 114 L.Ed.2d 572 (1991) (plurality opinion), the test they contend Justice Gordon should have applied. In *Lehnert*, the Court provided its most recent guidance with respect to union chargeability determinations. A majority of the Court agreed that chargeable activities in the union shop context "must (1) be 'germane' to collective bargaining activity; (2) be justified by the government's vital policy interest in labor peace and avoiding 'free riders'; and (3) not significantly add to the burdening of free speech that is inherent in the allowance of an agency or union shop." *Id.* at 519, 111 S.Ct. at 1959. From this statement, Plaintiffs argue that the impartial decisionmaker should have assessed whether a given activity "(1) [was] germane to the practice of law; (2) [was] justified by the government's vital policy interest in regulating the legal profession or improving the quality of legal services available to the people of the State; and (3) [did] not significantly add to the burdening of free speech that is inherent in the allowance of an integrated bar association." Pls.' Mem. Supp.3d Enforce J. at 3 n. 1. Plaintiffs

specifically attack Justice Gordon's focus on whether a given activity is characterizable as political or ideological. They argue that whether a given activity has ideological coloration "is not the *sine qua non* or even a principal factor determining chargeability. The only relevance of the political or ideological nature of an activity is under the third criterion, if it is even reached.... [T]he initial determinations are whether the activities are germane and justified...." *Id.* at 3.

■ A review of Justice Gordon's decision leads the Court to conclude that he used the correct standard. Justice Gordon extensively discussed the applicable law in his opinion. *In re: Challenges to the New Mexico State Bar Budgets for the Years 1991–1994,* July 6, 1994 N.M. State Bar Bull. at 4 (hereinafter "Decision"). He acknowledged the *Keller* formulation, writing that activities necessarily or reasonably related to the purposes of regulating the legal profession or improving the quality of legal services "are considered *germane* and chargeable to all members of the bar. Conversely, a bar may not use the mandatory fees of members who object to paying for activities that have political or ideological coloration *and* are not reasonably related to the bar's germane purposes." *Id.* at 4 (emphasis in original). Justice Gordon also cited *Schneider v. Colegio de Abogados de Puerto Rico,* 917 F.2d 620, 627–632 (1st Cir.1990), *cert. denied,* 502 U.S. 1029, 112 S.Ct. 865, 116 L.Ed.2d 772 (1992), in which the First Circuit approved mandatory bar activities relating to attorney competence, increasing the availability of legal services, and improving court operations, as well as expenditures for activities lacking expressive content for the benefit all members, such as insurance and social activities. Decision at 4. In his conclusion, Justice Gordon wrote that all expenses save those relating to the golf tournament were either not for political or ideological activities, or "[i]f arguably any contained ideological coloration, that ideology was subsumed by virtue of the fact that the activity either was reasonably related to the regulation or improvement of the Bar of New

Mexico or to the improvement of the delivery of legal services...." Decision at 17.

The *Lehnert* test, as adapted to fit the state bar context, does not appear to modify or supplement the *Keller* formulation or add significantly to the analysis. The first two prongs of this test are essentially restatements of the same concept articulated by the Supreme Court in *Keller:* chargeable activities must be germane or reasonably related to (or justified by the state's interest in) the practice of law, the regulation of the legal profession, or the improvement of the delivery of legal services.[2] As for the third prong—activities must "not significantly add to the burdening of free speech that is inherent" in compelling financial support of a union or state bar—Justice Gordon correctly accounted for those types of activities which the Supreme Court intended this prong to address. The Court in *Lehnert* explained the third prong in its discussion of the Court's previous decision of *Ellis v. Railway Clerks,* 466 U.S. 435, 456, 104 S.Ct. 1883, 1896, 80 L.Ed.2d 428 (1984):

[I]n *Ellis,* the Court considered, among other issues, a First Amendment challenge to the use of dissenters' funds for various union expenses including union conventions, publications, and social events. Recognizing that by allowing union-security arrangements at all, it has necessarily countenanced a significant burdening of First Amendment rights, it limited its inquiry to whether the expenses at issue "involve[d] *additional* interference with the First Amendment interests of objecting employees...." 466 U.S. at 456 [104 S.Ct. at 1896] (emphasis added).

... The dissenting employees in *Ellis* objected to charges relating to union social functions, not because those activities were inherently expressive or ideological in nature, but purely because they were sponsored by the union.

*Lehnert,* 500 U.S. at 518, 111 S.Ct. at 1958. Thus, the third prong of the *Lehnert* test evaluates whether compulsory monetary support of a given activity does not add to the extant infringement of First Amendment

**2.** If anything, Plaintiffs' *Lehnert*-derived "germane to the practice of law" criteria seems to

expand the *Keller* test for chargeability, possibly beyond what the Supreme Court intended.

rights, and simply restates the rule the Supreme Court previously developed in *Ellis*. Justice Gordon found chargeable to the membership expenses incurred for construction of the new State Bar Center, publications, social activities, various meetings, and an annual convention—activities the third prong specifically addresses. Plaintiffs' objections to these non-ideological activities, most of which possessed no communicative content, can only be due to the fact that it was the Bar that conducted them.

Additionally, Justice Gordon's evaluation of whether an expenditure possessed a political or ideological component was entirely appropriate, even assuming Plaintiffs' *Lehnert*-derived test applies. Contrary to Plaintiffs' argument, the political or ideological nature of an activity is relevant to all three prongs, and not just the third prong, of their proposed *Lehnert*-based test. All other things being equal, an expenditure with a strong political or ideological coloration is less likely to be germane to the practice of law, less likely to be related to or justified by the state's interest in regulating the legal profession or improving the quality of legal services, and more likely to add to the existing burden of First Amendment rights. *See* note 3 *infra*.

■ Of course, even if a given activity possesses communicative content of a political or ideological nature, it may nevertheless be reasonably related to the practice of law, to the regulation of the legal system, or to the improvement of legal services. Justice Gordon's refusal to strike down activities of some political or ideological content was not only appropriate but necessary if the Bar is to be permitted to pursue its legitimate goals. *See Lehnert*, 500 U.S. at 528, 111 S.Ct. at 1963 (despite recognizing the "political and expressive nature of litigation," Court permits compulsory dues-financed litigation that directly relates to the objecting employ-ees' bargaining unit); *Gibson v. Florida Bar*, 798 F.2d 1564, 1569 (11th Cir.1986) ("[T]he Florida Bar may use compulsory dues to finance [lobbying] only to the extent that it assumes a political or ideological position on matters that are germane to the Bar's stated purposes."), *cert. dismissed*, 502 U.S. 104, 112 S.Ct. 633, 116 L.Ed.2d 432 (1991). It is impossible to allow mandatory state bars to pursue such broad objectives as regulating the legal profession or improving the delivery of legal services (or to permit activities that are "germane to the practice of law"), without at the same time approving of activities that will inevitably carry some ideological or political baggage. Unless the Supreme Court is willing to overrule *Keller* and recast a mandatory bar's permissible pursuits, *see Gibson*, 798 F.2d at 1569 (describing the bar's purposes as "amorphous"), compulsory financial support of some activities with at least a modicum of ideological content is inevitable. *See Schneider*, 917 F.2d at 632 (dues-financed lobbying for increased appropriations for judicial positions, for increased salaries for government attorneys, for the certification of legal specialists, or against restrictions on attorney advertising, are permissible under the First Amendment because such lobbying is "limited" to regulating the legal profession or improving the quality of legal services); *Gibson*, 798 F.2d at 1569 n. 4 (listing similar lobbying goals integrated bars may pursue).[3]

In summary, Justice Gordon applied the correct standard of chargeability. Even if *Lehnert* should have played a role in the impartial decisionmaker's analysis, any error is harmless in that, as the next section reveals, Justice Gordon undoubtedly reached the correct results. *See Pilots Against Illegal Dues v. Air Line Pilots Ass'n*, 938 F.2d 1123, 1127, 1131–32 (10th Cir.1991) (upholding district court's chargeability determina-

---

**3.** Acknowledging that some activities of a political or ideological character may be funded by compulsory dues if germane is not to imply that the political or ideological nature of an activity is irrelevant to the inquiry. A given activity might be reasonably related to the Bar's legitimate purposes, and yet possess such strong political or ideological content as to run afoul of the First Amendment. To illustrate, *pro bono* activities are generally germane to the goal of improving the delivery of legal services to the public. *Pro bono* support for, say, the National Rifle Association or Planned Parenthood, however, has such strong political or ideological overtones as to raise the question of whether such support is intended to improve the delivery of legal services, or is instead designed to affirmatively support such groups' political goals.

tions despite district court's failure to recognize *Lehnert;* "[T]he balance of the court's analysis shows that the court generally applied the proper standard. . . .").

## B. THE MERITS OF JUSTICE GORDON'S FINDINGS

In their motion to enforce the Court's judgment and to vacate the decision of the impartial decisionmaker, Plaintiffs seek reversal of Justice Gordon's chargeability findings with respect to costs incurred for the State Bar Center and for defending the present litigation. In their motion to reconsider Judge Burciaga's August 24, 1994 order, Plaintiffs contest whether lobbying activities and costs associated with the Bar's "Task Force to Assist Gulf Military Personnel and Families" are chargeable to the membership.

■ Although an independent decisionmaker's chargeability conclusions carry no preclusive weight in a subsequent section 1983 action, *Hudson,* 475 U.S. at 308 n. 21, 106 S.Ct. at 1077 n. 21, "courts should not involve themselves in the factual inquiries involved in making a chargeability determination." *Lowary v. Lexington Local Bd. of Educ.,* 903 F.2d 422, 433 (6th Cir.1990) (citing *Abood v. Detroit Bd. of Educ.,* 431 U.S. 209, 240, 97 S.Ct. 1782, 1802, 52 L.Ed.2d 261 (1977) and *Railway Clerks v. Allen,* 373 U.S. 113, 123–24, 83 S.Ct. 1158, 1164, 10 L.Ed.2d 235 (1963)), *cert. denied,* 498 U.S. 958, 111 S.Ct. 385, 112 L.Ed.2d 396 (1990). Indeed, Justice Gordon's findings are entitled to "great weight." *Id.* at 433 n. 3. *See also Weaver v. University of Cincinnati,* 970 F.2d 1523, 1535 (6th Cir.1992) (citing *Lowary* ), *cert. denied,* —— U.S. ——, 113 S.Ct. 1274, 122 L.Ed.2d 668 (1993); *Bromley v. Michigan Educ. Ass'n,* 843 F.Supp. 1147, 1154 (E.D.Mich.1994) (court will accord "as much deference to the arbitration award as is consistent with the mandate of § 1983," particularly with respect to factual issues).

### 1. State Bar Center

■ Plaintiffs object to the Bar's acquisition of excess office space in the new Bar Center. Conceding that carrying excess office space does not constitute political or ideological activity, Plaintiffs nonetheless maintain that "this type of entrepreneurial undertaking is not germane to the practice of law and is not in any manner justified by the government's vital policy interest in regulating the legal profession or improving the quality of legal services. . . ." Pls.' Mem. Supp.3d Enforce J. at 4–5. Justice Gordon correctly concluded that Plaintiffs' objections in this regard "[do not] state valid grounds under the First Amendment. . . ." Decision at 8. The Justice also explained how construction of the excess space is indeed reasonably related to the Bar's legitimate purposes:

> The remaining 8,000 to 10,000 square feet would be available for the growth of the Bar and its functions in the future. In the meantime, the available excess could be rented to Bar-related entities. . . . The architect counselled that it would be cheaper to build to anticipate growth, rather than attempt to add on to a smaller building later.
>
> . . . . . .
>
> . . . [S]avings in rent can be used to reduce the dues paid by members to a level below what they are now paying for a lesser facility. . . .
>
> . . . [T]he Bar's stated plan during the time in which the excess space is not needed is to rent space to law related entities which would benefit from economies of cost and avoiding delays between separated but interrelated entities. Also, the Supreme Court has indicated its desire to improve the public's access to the various arms of the Bar and Court's Committees and Boards at the same location.

Decision at 9.

As discussed *supra,* the Bar Center construction expenditures pose no additional infringement of First Amendment rights beyond that already countenanced by permitting the mandatory bar. Construction of a building or maintenance of excess space are activities with no communicative value and expressing no ideological or political viewpoint; as such, they do not meaningfully implicate the core First Amendment principle of preventing compelled ideological conformity. Plaintiffs "may feel that their mon-

ey is not being well-spent, but that does not mean they have a First Amendment complaint." *Ellis*, 466 U.S. at 456, 104 S.Ct. at 1896. *Cf. Pilots Against Illegal Dues*, 938 F.2d at 1131 (permitting dues-financed "war chest" contingency fund).

### 2. Lobbying Activities

■ Apparently, Plaintiffs make a blanket objection to all Bar-sponsored lobbying. Pls.' Mem.Supp. Reconsider at 6. Their objection finds no support in the relevant caselaw. Lobbying is permitted if it is related or germane to the organization's purposes. *See supra; Lehnert*, 500 U.S. at 519–20, 111 S.Ct. at 1959–60; *Schneider*, 917 F.2d at 632; *Gibson*, 798 F.2d at 1569. The specific lobbying activities in question, all of which easily pass muster, are as follows: support for funds for three new Court of Appeals judges and for salary increases of judicial staff; support for changes to compensation packages for state-employed lawyers and their staff; support for the Judicial Information System; and support for increased funding for court-appointed representation in child abuse and neglect cases. "All of these lobbying activities ... were either to improve the courts of New Mexico, the lawyers who served them, or the people served by them, thus improving the delivery of legal services...." Decision at 6.

Section lobbying for or against legislation is funded by voluntary dues only. Decision at 6. If Plaintiffs object to lobbying by the section of which they are members, they need not contribute. Bar staff support is provided merely to ensure that each section complies with certain notice and voting procedures. *Id.*

### 3. Task Force to Assist Gulf Military Personnel and Families

■ Plaintiffs attack this activity as "compelling Bar members' financial support to actively and affirmatively assist a war effort...." Pls.' Mem.Supp. Reconsider at 7. In contrast, Justice Gordon described this activity as

a short term effort to provide pro bono legal services to military reservists and family members in New Mexico in relation to the deployment of personnel during Op-

eration Desert Storm in 1991. This Task Force generated articles for two special supplements in the *Bar Bulletin* providing all attorneys relevant substantive information that would benefit affected clients. Both the educational activities and the pro bono program improved the quality of legal services and helped to provide expedited assistance to this segment of the public.

Decision at 11.

■ A state bar may spend compulsory dues on *pro bono* activities in pursuing the goal of improving the delivery of legal services. *Schneider*, 917 F.2d at 631; *Washington Legal Found. v. Massachusetts Bar Found.*, 795 F.Supp. 50, 55–56 & n. 11 (D.Mass.1992), *aff'd*, 993 F.2d 962 (1st Cir. 1993). Providing specialized information to practicing attorneys is also permissible. *Keller*, 496 U.S. at 8, 110 S.Ct. at 2233 ("[E]levating the educational and ethical standards of the Bar to the end of improving the quality of the legal service available to the people of the State [is] a legitimate end of state policy." (quoting *Lathrop*, 367 U.S. at 842–43, 81 S.Ct. at 1837–38)). Plaintiffs' objection must, therefore, relate to the fact that the Bar's *pro bono* efforts were focused on those specially affected by the large mobilization of reservists during the Gulf War.

■ Military reservists and their families, not insignificant in number, faced adverse employment consequences and other problems as a result of the 1991 Gulf War mobilization. Although the Court is not aware of any caselaw directly on point, the Court believes that the First Amendment is not offended if an integrated bar targets a specific group for *pro bono* legal aid because that group requires specialized assistance or suffers from unique legal difficulties. Provided that its selection is based on ideologically neutral criteria, the Bar should be free to allocate limited *pro bono* resources to those groups deemed most in need, or to those whose special needs are not being met. The Bar could not, of course, support legal aid for gun rights advocates or pro-abortion groups; the Bar would be hard-pressed to justify support for such groups on non-ideological grounds. *See note 3, supra.* However, the Bar made at least a *prima facie* showing that

its funding of legal aid for military reservists was not ideologically motivated. As Plaintiffs submitted no evidence to the contrary, Justice Gordon's finding in this regard stands.

### 4. Litigation Costs and Attorney's Fees

■ Plaintiffs contend Justice Gordon erred when he found that the Bar's costs of defending the present litigation were germane and chargeable. Of these expenses, Justice Gordon wrote, "Having been sued, [the Bar] has the right to defend itself by hiring and paying for legal representation.... Defending against a lawsuit is not a political or ideological act. The expenses of litigation are costs necessary to doing business as an organization." Decision at 7. They attack this finding on both constitutional and statutory grounds.

Plaintiffs first argue that the Bar may not, consistent with the First Amendment, pass on these costs to the membership. Plaintiffs assert that "defending the Bar's violations of the First Amendment rights of its own members is [not] a germane activity and [is not] justified by the Bar's regulatory role." Pls.' Mem.Supp.3d Enforce J. at 6. They also disagree with Justice Gordon's remark that defending against a lawsuit is not a political or ideological act. "This ... conclusion is an affront to the Constitution and directly contrary to First Amendment jurisprudence. *See, e.g., NAACP v. Button,* 371 U.S. 415, 431, 83 S.Ct. 328, 337, 9 L.Ed.2d 405 (1963) ("[A]ssociation for litigation may be the most effective form of political association"); *In re Primus,* 436 U.S. 412, 428, 98 S.Ct. 1893, 1903, 56 L.Ed.2d 417 (1978) ("Litigation ... is a form of political expression and association")...." *Id.*

■ The First Amendment does not render the Bar powerless to defend itself in court. Once again, Plaintiffs object to this activity merely because it is the Bar that is conducting it. Defending against a lawsuit is *not* a political or ideological act—it is instead a necessary incident to conducting business and maintaining the Bar's existence, as Justice Gordon observed. The decisions of *NAACP v. Button* and *In re Primus* relate to the act of *bringing* lawsuits (or exercising selective discretion as to which lawsuits to defend) as forms of political expression. *Primus,* 436 U.S. at 414, 425 & n. 16, 431–32, 98 S.Ct. at 1895, 1901 & n. 16, 1904–05; *Button,* 371 U.S. at 419–20, 428–31, 83 S.Ct. at 330–31, 335–37. When one is sued directly, however, one hardly has a choice but to defend oneself. As such, costs of defending direct litigation are fully chargeable to the membership. *Lehnert,* 500 U.S. at 528, 111 S.Ct. at 1963; *Ellis,* 466 U.S. at 453, 104 S.Ct. at 1894; *Pilots Against Illegal Dues,* 938 F.2d at 1129.

■ Plaintiffs' second argument relates to attorney's fees and costs the Court awarded to Plaintiffs pursuant to 42 U.S.C. § 1988(b). On October 18, 1993, Judge Burciaga entered an award to which the parties stipulated in the amount of $50,000, "in full and complete satisfaction and liquidation of [Plaintiffs'] claims for reimbursement for and compensation of all reasonable attorneys' fees, expenses, taxes and costs...." *Popejoy v. New Mexico Bd. of Bar Commr's,* Civ. No. 92–1462 JB, Stipulated Order at 2, 1993 WL 786963 at *1 (D.N.M. filed Oct. 18, 1993). The litigation costs the Bar charged to the membership included this $50,000 payment. Plaintiffs now assert that section 1988 compels the Bar to reduce that portion of their dues attributable to the attorney's fees and costs award.[4]

---

4. Plaintiffs have propounded inconsistent versions of their argument in this regard. In their memorandum brief in support of their third motion to enforce the Court's judgment, they argue that all members of the Bar are entitled to a refund of those dues corresponding to costs incurred in defending the present litigation. "In accordance with [section 1988], Plaintiffs (*and the class whom they represent*), acting as private attorneys general, may not be compelled to bear the costs of their success of prevailing in identifying and abating Defendants' unconstitutional practices." Mem.Supp.3d Enforce J. at 6 (em-

phasis added). (Plaintiffs filed this suit as a class action on behalf of all "persons who are attorneys duly licensed and admitted to practice law in the State of New Mexico." Complaint ¶ 2.) Defendants pointed out in their response brief that the logical conclusion to Plaintiffs' argument is that the Bar would be powerless to defend itself in a lawsuit; the Bar's operating income derives solely from dues, which, according to Plaintiffs, may not be used to finance the defense of this litigation. In their reply brief, Plaintiffs deride Defendants' hypothesis as "frivolous," Re-

Plaintiffs cite no caselaw supporting the proposition they advance. Their argument is analogous to a section 1983 plaintiff prevailing in a civil rights lawsuit against a municipality, obtaining attorney's fees pursuant to section 1988, and then suing the municipality for a refund of that portion of his local property taxes the municipality used to defend against his lawsuit. The purpose of section 1988(b) is to provide to victims of constitutional violations, who oftentimes have not suffered quantifiable injuries, an incentive (or removal of a disincentive) to bring suit and a means of attracting legal representation. *Maine v. Thiboutot,* 448 U.S. 1, 9–10, 100 S.Ct. 2502, 2506–07, 65 L.Ed.2d 555 (1980); *Ortiz v. Regan,* 980 F.2d 138, 140 (2d Cir.1992); *Northcross v. Board of Ed. of Memphis,* 611 F.2d 624, 635 (6th Cir.1979), *cert. denied,* 447 U.S. 911, 100 S.Ct. 2999, 3000, 64 L.Ed.2d 862 (1980); *Scott v. Bradley,* 455 F.Supp. 672, 674 (E.D.Va.1978). That purpose has been adequately served in this case. Plaintiffs have received a "reasonable" attorney's fees and costs award, 42 U.S.C. § 1988(b), and need not be awarded an additional proportionate refund of their dues, which would in any event be *de minimis.*[5]

## II. THE AUGUST 24, 1994 MEMORANDUM OPINION AND ORDER

■ In his August 24, 1994 memorandum opinion and order, Judge Burciaga addressed whether the Bar's *pro rata* allocation of salary overhead satisfied *Hudson* procedural demands:

> The fact that Defendants have apportioned the salaries to each category does not change the potential for abuse. However, Plaintiffs have failed to present any credible evidence to this Court, and apparently failed to present any credible evidence on this point at the April 25–26 hearing before

Justice Gordon, that any of Defendants' expenditures under general administration were for a non-germane purpose. Thus, Plaintiffs have failed to prove that *Defendants' violation of Hudson and Keller* have caused them any harm. [footnote 1] Therefore, the Court denies Plaintiffs' motion to enforce judgment.

*Popejoy v. New Mexico Bd. of Bar Commr's,* Civ. No. 92–1462 JB, Mem. Op. and Order at 3–4, 1994 WL 823551 at *2 (D.N.M. filed Aug. 24, 1994) (emphasis added). Footnote 1 states, "The Court wants to make clear that Plaintiffs have failed to meet their burden in proving that at least some of the expenditures under the general administration category went to non-germane purposes. The Court is not suggesting that Plaintiffs had the burden to prove what percent of the expenditures were for non-germane purposes." *Id.* at 4 n. 1.

■ Plaintiffs correctly maintain that they do not bear the burden of proving non-germaneness. Challengers bear only the burden of making their objections known; the Bar must prove that the expenditures were germane and chargeable. *Hudson,* 475 U.S. at 306, 106 S.Ct. at 1075; *Popejoy,* 831 F.Supp. at 819. The Court therefore amends the August 24, 1994 memorandum opinion and order accordingly. However, the Court will in all other respects deny Plaintiffs' motion for reconsideration.

As discussed, the Bar failed to keep time records of how Bar employees spent their salaried time. A *pro rata* allocation was simply the only way to estimate salary expenses incurred for various of the Bar's activities. Plaintiffs repeatedly emphasize their observation that this allocation method consequently fails to ascertain with precision the amounts spent on each activity. Yet if each activity is undisputedly germane and chargeable, then determining with pinpoint

ply Supp.3d Enforce J. at 9, yet in response to it Plaintiffs changed their argument: now they alone (meaning, supposedly, the named Plaintiffs) are entitled to a proportionate refund of dues, and the Bar must instead look to the non-challenging members of the Bar (i.e., everyone else) to pay the attorney's fees and costs in question. *Id.* at 9–10. The Court assumes that Plaintiffs are advancing the later version of their argument.

5. The Bar includes approximately 5200 active members and 700 inactive members. Taking only the active members into account, Plaintiffs' proportionate refund of their $50,000 award in this context would amount to less than $10.00 each.

accuracy the amounts spent is a meaningless exercise.

The fact remains that the Bar's only non-germane expenditures for the years in question are those relating to the golf tournament—totalling a relatively insignificant $698.00, Decision at 17—and Justice Gordon ordered a refund comprised of the sum of both the direct and indirect costs, including salary overhead, allocated to that tournament (amounting to approximately 13 cents for each active member). As discussed in the previous section, the vast majority of the expenses to which Plaintiffs objected were germane and chargeable. Although Plaintiffs did not properly bear the burden of demonstrating non-germaneness, Defendants met their burden of demonstrating germaneness. Thus, Plaintiffs have indeed not been harmed by the *pro rata* allocation of overhead, assuming that this method somehow runs afoul of *Hudson* procedural requirements. In the words of Judge Burciaga, even if the *pro rata* allocation of salary overhead "does not change the potential for abuse," *Popejoy*, Aug. 24, 1994 Mem. Op. and Order at 3, it has "not caused [Plaintiffs] any harm." *Id.* at 4.

In any event, the Court finds that the *pro rata* allocation satisfied the dictates of the First Amendment. Justice Gordon's discussion of this allocation method is as follows:

> I find that under the circumstances the method the Bar has used of attributing a pro rata share of overhead ... is a fair method of allocation.... I could find no other or better method with which to allocate indirect costs to each program.... It does seem reasonable to assume ... that overhead costs in each program will be roughly proportional to the amount of direct expenditures for each program.

Decision at 5–6. As a factual determination, Justice Gordon's assessment is subject to considerable deference, *see supra* section I.B., particularly where, as here, the impartial decisionmaker had no evidence to the contrary before him. "[I]t is not inconsistent with § 1983 to give great deference to the arbitrator's approval of accounting procedures ..., especially when ... no evidence challenging the accounting procedures was

offered." *Bromley*, 843 F.Supp. at 1154. *See also Lucid v. City & County of San Francisco*, 774 F.Supp. 1234, 1237 (N.D.Cal. 1991) (technical evaluation of financial statements and the accounting methods employed should be left to the arbitrator because it is a task "which courts are not only ill-suited to perform, but ... goes far beyond that contemplated by *Hudson.*").

Judge Burciaga's January 25, 1994 order required the Bar to "allocate the expenses for 'Administrative Office Salaries' to program activities so that Bar members have sufficient information to decide whether to object...." *Popejoy*, 847 F.Supp. at 158. Significantly, in instructing the Bar as to how to comply with *Hudson*, Judge Burciaga expressed his implicit approval of the California method of allocating administrative expenses "to specific program activities based upon the ratio of the program's expenditures to total program expenditures," *id.*—exactly what the Bar did in this case.

"Absolute precision" with respect to the Bar's accounting methods "cannot be expected or required." *Id.* at 157 (quoting *Hudson*, 475 U.S. at 307 n. 18, 106 S.Ct. at 1076 n. 18). The Bar need not provide information in such detail as to "enable the [member] to determine in any final sense whether the [organization's] proposed fee is a correct one, but only whether the information is sufficient to enable the [member] to decide whether to object." *Dashiell v. Montgomery County*, 925 F.2d 750, 756 (4th Cir.1991). "*Hudson* does not mandate a[n organization] to utilize the *most* detailed and effective service available to audit the financial information disclosed...." *Gwirtz v. Ohio Educ. Ass'n*, 887 F.2d 678, 682 (6th Cir.1989) (emphasis in original), *cert. denied*, 494 U.S. 1080, 110 S.Ct. 1810, 108 L.Ed.2d 941 (1990). The Bar's accounting method of allocating overhead on a *pro rata* basis satisfied *Hudson* and *Keller*.

In summary, the Court hereby amends the August 24, 1994 opinion to delete the references to the Plaintiffs' burden of proof and to any language affirmatively stating that the Bar has violated *Hudson* and *Keller*. The Court finds that the allocation method did not offend *Hudson* procedural mandates—

but that even if it did, Plaintiffs have not been harmed because all of the expenditures were germane (save for the golf tournament, for which the Bar has already provided a refund).

## III. THE NEW MEXICO SUPREME COURT'S ROLE IN NAMING THE IMPARTIAL DECISION-MAKER

■ In his January 25, 1994 opinion, Judge Burciaga took under advisement the issue of whether the New Mexico Supreme Court's role in appointing the impartial decisionmaker comports with *Hudson*'s admonition that the decisionmaker should not represent the Bar's "unrestricted choice." 475 U.S. at 308, 106 S.Ct. at 1077. *Popejoy*, 847 F.Supp. at 159. Judge Burciaga intended to address the issue after the parties had stipulated to certain facts regarding the New Mexico Supreme Court's role in Justice Gordon's selection and in the Bar's budget process. The parties did so on May 26, 1994. Omitted from Judge Burciaga's August 24, 1994 opinion, however, is any consideration of this pending issue.

The parties' stipulation as to the New Mexico Supreme Court's involvement is as follows:

> When the Supreme Court decided not to hear *Hudson/Keller* challenges to the 1991–1994 budgets itself, it solicited names both from the Board and from all State Bar members. The Court received no suggestions from the membership. It selected none of the candidates proposed by the Board. Instead on January 20, 1994, the Court designated Frank X. Gordon, Jr., former Arizona Supreme Court Chief Justice and member of the State Bar of Arizona, to be the independent decisionmaker. . . . In the January 20 letter, the Supreme Court explained its reasons for selecting Justice Gordon that it had tried to identify potential designees who possessed strong adjudicative skills and unblemished reputations, who did not belong to the State Bar of New Mexico, and who had not previously served as officers of any other state bar.

*Popejoy v. New Mexico Bd. of Bar Commr's,* Civ. No. 92–1462, Factual Stipulations of the Parties at 9–10 (D.N.M. filed May 26, 1994).

The impartial decisionmaker was not the Bar's unrestricted choice; in fact, Justice Gordon was not the Bar's choice at all. Moreover, the Supreme Court solicited suggestions from the membership, although it was not obligated to do so, *Weaver,* 970 F.2d at 1534 (challengers need not participate in the arbitrator's selection), and yet no member, including any of the Plaintiffs in this action, made any suggestions. Justice Gordon's selection passes muster under *Hudson.*

## IV. DEFENDANTS' MOTION TO DISMISS

In the judgment filed pursuant to the issuance of the August 26, 1993 memorandum opinion and order, the Court retained jurisdiction to ensure Defendants' compliance with the Court's directives, but expressly instructed Defendants that they may move for a motion to dismiss after they have so complied. This memorandum opinion resolves all outstanding issues remaining in the case. The Court will therefore grant Defendants' motion to dismiss.

The Court will enter an appropriate order.

### ORDER AND FINAL JUDGMENT

THIS MATTER comes before the Court on Plaintiffs' third motion to enforce judgment and to vacate the decision of the impartial decisionmaker, filed August 22, 1994 (Docket No. 78), Plaintiffs' motion to reconsider the Court's memorandum opinion and order of August 24, 1994, filed September 8, 1994 (Docket No. 85), and Defendants' motion to dismiss, filed July 28, 1994 (Docket No. 73). A memorandum opinion was entered on this date. For the reasons set forth therein, the Court finds that Plaintiffs' third motion to enforce judgment is not well taken and is denied; that Plaintiffs' motion to reconsider is well taken in part and is granted in part, and that Defendants' motion to dismiss is well taken and is granted.

IT IS, THEREFORE, ORDERED that:

1. Plaintiffs' third motion to enforce judgment and vacate the decision of the impartial decisionmaker (Docket No. 78) is denied.

2. Plaintiffs' motion to reconsider (Docket No. 85) is granted in part: the August 24, 1994 memorandum opinion and order is amended to delete any suggestion that Plaintiffs bore the burden of proof or that Plaintiffs failed to meet their burden of proof, and to delete any language affirmatively stating that the Bar has violated *Hudson* and *Keller*.

3. Defendants' motion to dismiss (Docket No. 73) is granted.